**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**June 6, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

BLAINE FRANKLIN SHAW, individually
and on behalf of a class; SAMUEL JAMES
SHAW, individually and on behalf of a
class; JOSHUA BOSIRE, individually and
on behalf of a class,

     Plaintiffs - Appellees,

and

MARK ERICH; SHAWNA MALONEY,
individually and as the mother and natural
guardian of minors D.M. and M.M.,

     Plaintiffs,

v.

MASTER TROOPER DOUG SCHULTE,
in his individual capacity; TECHNICAL
TROOPER BRANDON McMILLAN, in
his individual capacity,

     Defendants - Appellants,

and

HERMAN JONES, in his official capacity
as the Superintendent of the Kansas
Highway Patrol,

     Defendant.

Nos. 21-3130, 21-3131

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:19-CV-01343-KHV-GEB)**

_____

Arthur S. Chalmers, Assistant Attorney General (Derek Schmidt, Attorney General, with him on the briefs), Office of the Attorney General for the State of Kansas, Topeka, Kansas, for Defendants – Appellants.

Joshua Pierson, American Civil Liberties Union and American Civil Liberties Union Foundation of Kansas, Overland Park, Kansas (Sharon Brett, Kayla DeLoach, American Civil Liberties Union and American Civil Liberties Union Foundation of Kansas, Overland Park, Kansas; and Leslie Greathouse, Patrick McInerney, Madison Perry, Spencer Fane LLP-KC, Kansas City, Missouri, with him on the brief), for Plaintiffs – Appellees.

_____

Before **TYMKOVICH**, Chief Judge, **HARTZ** and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

This case, with claims arising under 42 U.S.C. § 1983, stems from traffic stops of Blaine and Samuel Shaw and of Joshua Bosire that were prolonged for K-9 sweeps. Before the district court, Master Trooper Doug Schulte and Technical Trooper Brandon McMillan moved for summary judgment based on qualified immunity. The district court denied the motions. We affirm in part and reverse in part.

Material issues of fact underly whether Troopers Schulte and McMillan had arguable reasonable suspicion to extend the stops. Thus, the Shaws and Mr. Bosire may proceed on their § 1983 claims against Trooper Schulte and Trooper McMillan, respectively. We, however, reverse the district court's denial of summary judgment

on two matters: (1) the scope of the Shaws' claim and (2) Mr. Bosire's claim against Trooper Schulte.

## I.   STANDARD OF REVIEW & JURISDICTION

We start by setting out the standard of review because it impacts the framework for reaching factual assumptions for purposes of summary judgment. Typically, we review a ruling on summary judgment de novo, and "need not defer to factual findings rendered by the district court." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1180 (10th Cir. 2018) (quotation marks omitted). But the interlocutory nature of an appeal from the denial of summary judgment based on qualified immunity limits our jurisdiction to "the abstract legal questions of (1) whether, accepting the facts the district court concluded a reasonable jury could find based on the summary judgment evidence, those facts constitute a legal violation, and (2) whether that legal violation was clearly established at the time of the violation." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1168 (10th Cir. 2021). Thus, we "usually must take [a district court's factual assumptions] as true" when conducting our appellate review. *Ralston v. Cannon*, 884 F.3d 1060, 1066–67 (10th Cir. 2018). If, however, "the district court fails to make its factual assumptions explicit, we may undertake a cumbersome review of the record to ferret out facts that the district court likely assumed." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008) (internal quotation marks omitted).

Here, the district court resolved the motions for summary judgment through text orders but later held a hearing at which it stated some reasons for denying

3

summary judgment. Thus, it is debatable whether the district court explicitly stated the factual assumptions underlying its ruling. We need not resolve this matter, however, because, reviewing the record de novo and viewing "the evidence in the light most favorable to the nonmoving party," *Clark v. Edmunds*, 513 F.3d 1219, 1221–22 (10th Cir. 2008), we would reach most of the factual assumptions stated by the district court during the hearing. And, to the extent our factual assumptions differ slightly, the differences do not alter our dispositions.

## II.    BACKGROUND

This appeal involves a pair of roadside traffic stops along I-70 in western Kansas that troopers extended to allow for inspection by dogs trained to detect controlled substances—K-9 sweeps. We start by describing Trooper Schulte's stop of the Shaws, and then we describe Trooper McMillan's stop of Mr. Bosire. Finally, we discuss the procedural history of the litigation.

### A.    *Trooper Schulte's Stop of the Shaws*

Blaine Shaw and Samuel Shaw were traveling westbound on I-70 in a minivan registered to their father, with Blaine driving and Samuel sitting in the front passenger seat.[1] Trooper Schulte was also traveling westbound on I-70. Blaine approached Trooper Schulte's patrol car at a speed in excess of the posted speed limit. Trooper Schulte activated his lights and siren *before* the Shaws' minivan reached Trooper Schulte's position on the roadway. Blaine passed Trooper Schulte

---

[1] Because Blaine and Samuel share the same last name, we refer to them by their first names when discussing an action attributable to only one of them.

and then moved over to the right lane, approximately four to five center-dividing dash-lines in front of Trooper Schulte. After about twenty seconds of maintaining this distance, Blaine slowed for traffic in front of him and Trooper Schulte closed the distance between the two vehicles to approximately two dash lines. The vehicles maintained this distance for a little under thirty seconds until Blaine reached an exit ramp. Blaine, followed by Trooper Schulte, exited I-70 and pulled over onto the shoulder near the base of the exit ramp.

Before exiting his patrol car to speak with Blaine, Trooper Schulte learned the vehicle was registered to Ronald Shaw. As Trooper Schulte approached the minivan on foot, he peered into the rear of the minivan. During the interaction, Blaine provided Trooper Schulte his driver's license and an insurance card and informed Trooper Schulte the vehicle belonged to his father, but that he was listed on the insurance. Trooper Schulte returned to his patrol car, again peering into the rear of the vehicle. In his declaration, Trooper Schulte described the vehicle as "crowded with stuff" and "having a lived in look."[2] App. Vol. 2 at 80, 83. Back in his patrol car, Trooper Schulte requested a records check on Blaine, which revealed a 2009 felony intent to distribute narcotics arrest.

Trooper Schulte reapproached the minivan, issued Blaine a citation, and informed Blaine he was free to leave. Although Trooper Schulte initially started back

---

[2] The Shaws dispute the minivan had a "lived-in look," with Blaine attesting the duo "were travelling with camping gear and our luggage but the van was clean." App. Vol. 3 at 95.

5

toward his patrol car, he reversed direction and inquired of Blaine if he could ask a question, to which Blaine responded "Yeah." *Id.* at 81. Trooper Schulte asked Blaine where he was headed, to which Blaine indicated Denver to "see family." *Id.* After asking if there were any weapons in the vehicle and receiving a response in the negative, Trooper Schulte asked for consent to search the vehicle. Blaine refused consent, stating "I don't consent to searches, I am [a] criminology major. It is like the number one golden rule." *Id.* at 82.

Trooper Schulte walked back toward his patrol car, informed a dispatcher that Blaine had refused his request for a search, and requested a K-9 unit. In discussing the refusal of the search with the dispatcher, Trooper Schulte mentioned Blaine's reason while making what a reasonable jury could describe as a smug facial gesture in the process. Trooper Schulte also stated that Samuel was acting in a "nervous and really jumpy" manner, keeping his hands in his lap and staring straight forward while Trooper Schulte spoke with Blaine.[3] Ex. 2a at 16:58–17:01.

A K-9 unit arrived at the scene approximately twenty-five minutes after Blaine declined consent. Four minutes into the K-9 sweep, the dog alerted. The dog's alert prompted Trooper Schulte to conduct a search of the vehicle, during which he located a Colorado medical marihuana card in Blaine's name. Trooper Schulte believed the Colorado medical marihuana card could be indicative of illegal conduct because

---

[3] The Shaws dispute that Samuel acted in a nervous or suspicious manner, describing his mannerism as "calm[]," "quiet[]," and "non-confrontational." App. Vol. 3 at 110; *see also id*. at 96.

6

Blaine was a citizen of Oklahoma. Trooper Schulte directed Blaine to a Kansas Highway Patrol ("KHP") headquarters so he could photocopy the medical marihuana card. After photocopying the paperwork, Trooper Schulte permitted the Shaws to resume their trip to Colorado.

### B.      Trooper McMillan's Stop of Mr. Bosire

The record evidence timely placed before the district court presents a less clear picture of the events leading to Trooper McMillan's stop of Mr. Bosire. Trooper McMillan and Trooper Schulte were at a Love's gas station off I-70 in western Kansas. When Troopers McMillan and Schulte exited the Love's, they smelled the odor of marihuana. Trooper McMillan stood outside of the Love's for up to five minutes and, at some point, "noticed two men (one black and the other white) standing and talking by [an] Altima." App. Vol. 2 at 171. From this, Trooper McMillan reached the conclusion that one or both men could be "associated with the marijuana smell." *Id.* As Trooper McMillan would later determine, Mr. Bosire was the African American individual. But in his declaration, Trooper McMillan did not (1) provide any reason for why he associated the marihuana smell with Mr. Bosire or (2) discuss whether he observed any other individuals at the Love's. For reasons also not apparent from the record, Trooper McMillan suspected Mr. Bosire and the white man were trafficking drugs, possibly caravanning.[4] Based on his experience, Trooper McMillan believed the Altima was a rental car, a suspicion he later confirmed.

---

[4] Caravanning involves individuals traveling in two vehicles, where the lead vehicle attempts to draw police attention while the trail vehicle transports the drugs.

It does not appear Trooper McMillan immediately acted upon his suspicions or kept a watchful eye on Mr. Bosire or the unidentified white man. The record reflects Trooper McMillan went to his patrol car and exited the Love's, observing a Dodge Charger "driving west on a street just north of [the Love's]." *Id.* at 171–72. For reasons unclear to the district court and to us, Trooper McMillan suspected the Dodge Charger (1) was a rental vehicle and (2) was associated with the white man who had been speaking with Mr. Bosire. But rather than follow the Dodge Charger, Trooper McMillan entered I-70, heading eastbound.

At some point on I-70 east, Trooper McMillan observed the Altima, operated by Mr. Bosire, driving in excess of the speed limit and conducted a traffic stop. Trooper McMillan approached the Altima, noticing Mr. Bosire had only slightly lowered the window. Trooper McMillan surmised Mr. Bosire was attempting to conceal something. But Mr. Bosire did lower his window further upon Trooper McMillan's request and Trooper McMillan did not smell the odor of marihuana emanating from the vehicle. Trooper McMillan did, however, observe that Mr. Bosire had cameras mounted in the vehicle and a notebook partially covered by a blanket in the back seat.

Upon request, Mr. Bosire provided his driver's license and car rental agreement. Per the rental agreement, Mr. Bosire was late in returning the vehicle. Trooper McMillan attempted to question Mr. Bosire about his travel plans but Mr. Bosire indicated only that he was traveling eastbound and then mentioned his right to remain silent. Trooper McMillan returned to his vehicle and drafted the

8

paperwork for a speeding warning. Before Trooper McMillan returned to the Altima, Trooper Schulte arrived at the scene. The two troopers conversed, with Trooper McMillan inquiring about the proximity of the nearest K-9 unit but also indicating his belief that he lacked reasonable suspicion to hold Mr. Bosire.

Trooper McMillan reapproached Mr. Bosire's vehicle with the intent to give him a warning for speeding and to question him about his presence at the Love's. Mr. Bosire gave a series of short answers and then, like during the first interaction, mentioned his right to silence. Trooper McMillan stated that Mr. Bosire was making him suspicious and asked Mr. Bosire if he could search the vehicle.[5] Mr. Bosire declined consent.

Trooper McMillan, without discussing with Trooper Schulte his second interaction with Mr. Bosire, directed Trooper Schulte to request a K-9 unit. Approximately twenty-two minutes elapsed as Mr. Bosire sat parked on the side of I-70 waiting for the K-9 unit to arrive and for the dog to conduct a sweep of the Altima. The dog did not alert. Trooper McMillan issued Mr. Bosire a warning for speeding and permitted Mr. Bosire to leave.

---

[5] In his declaration, Trooper McMillan asserts he "formed the belief that Mr. Bosire did not honestly . . . answer [his] questions." App. Vol. 2 at 176. Whether a reasonable officer could have believed Mr. Bosire provided dishonest answers or sought to invoke his right to silence and avoid interaction with Trooper McMillian is a dispute of fact properly resolved by a jury. For purposes of summary judgment, we must proceed under the factual assumption that Mr. Bosire, after having sought to invoke his right to silence during the first encounter, sought to avoid further verbal interaction with Trooper McMillan.

## C.    *Procedural History*

The Shaws initiated this action against Trooper Schulte in December 2019. Mr. Bosire joined the action, adding Trooper McMillan as a defendant. Before the close of discovery, Troopers Schulte and McMillan moved for summary judgment based on qualified immunity. The Shaws and Mr. Bosire contested the motions, identifying several disputes of fact and proffering additional factual propositions in their responses to summary judgment. Troopers Schulte and McMillan did not timely file a reply brief contesting the disputes of fact or the factual propositions advanced in the Shaws' and Mr. Bosire's responses.

The district court denied the motions for summary judgment through text orders:

> ORDER **overruling** . . . Motion for Summary Judgment Against Plaintiff[s] Bosire's [and Shaws'] Claims for substantially the reasons stated in . . . Memorandum In Opposition to Defendant's Motion for Summary Judgement. Signed by District Judge Kathryn H. Vratil on 6/22/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)

App. Vol. 1 at 25. Troopers McMillan and Schulte moved to alter or amend the judgment, seeking both reconsideration of the ruling and asking the district court to provide its reasoning for denying summary judgment. Troopers McMillan and Schulte also sought to file out-of-time reply briefs. The district court held a hearing at which it denied both the motion to alter or amend judgment and the motion to file out-of-time reply briefs. This interlocutory appeal followed.

### III.    DISCUSSION

We start by stating the qualified-immunity standard and then the standard generally governing reasonable suspicion. Cognizant that our jurisdiction is limited to legal issues, we then analyze the qualified-immunity defenses advanced by Troopers Schulte and McMillan, concluding (1) the Shaws may proceed with their action to the extent it alleges Trooper Schulte unlawfully detained them from the time Blaine declined consent to a search to when the drug dog alerted and (2) Mr. Bosire may proceed on his action against Trooper McMillan.

### A.    *Qualified Immunity Framework*

Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). To overcome a qualified immunity defense, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). We may address the two prongs in any order. *Id.*

"In order for a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 1004–05 (internal quotation marks omitted). "A plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains."
*Id.* at 1005 (internal quotation marks omitted). Additionally, "there can be the rare
obvious case, where the unlawfulness of the officer's conduct is sufficiently clear
even though existing precedent does not address similar circumstances." *Estate of
Ceballos v. Husk*, 919 F.3d 1204, 1218 (10th Cir. 2019) (quoting *District of
Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)) (quotation marks omitted).

While "the Supreme Court has 'repeatedly told courts not to define clearly
established law at a high level of generality,'" it has also explained that "'officials
can still be on notice that their conduct violates established law even in novel factual
circumstances.'" *Quinn*, 780 F.3d at 1005 (first quoting *al-Kidd*, 563 U.S. at 742,
then quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Ultimately, we must assess
whether "existing precedent [has] placed the statutory or constitutional question
beyond debate." *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 577 U.S. at 12).

### B.    *General Standard Governing Reasonable Suspicion*

An officer can "briefly detain a person for investigative purposes if the officer
has a reasonable suspicion supported by articulable facts that criminal activity may
be afoot, even if the officer lacks probable cause." *Cortez v. McCauley*, 478 F.3d
1108, 1115 (10th Cir. 2007). In assessing whether an officer had reasonable
suspicion, this court "must look at the totality of the circumstances of [the] case."
*United States v. Kitchell*, 653 F.3d 1206, 1218 (10th Cir. 2011). "For reasonable
suspicion to exist, an officer must 'articulate something more than an inchoate and
unparticularized suspicion or hunch.'" *United States v. Moore*, 795 F.3d 1224, 1229

(10th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

"Reasonable suspicion is not, and is not meant to be, an onerous standard." *Kitchell*, 653 F.3d at 1219 (internal quotation marks and citation omitted). In deciding if reasonable suspicion supported a detention, "we judge the officer's conduct in light of common sense and ordinary human experience and we accord deference to an officer's ability to distinguish between innocent and suspicious actions." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010) (internal quotation marks and citations omitted); *United States v. Walraven*, 892 F.2d 972, 975 (10th Cir. 1989) ("In determining the reasonableness of an investigative detention, '*common sense* and ordinary human experience must govern over rigid criteria.'" (emphasis added) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985))). "To satisfy the reasonable suspicion standard, an officer need not rule out the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (quotation marks omitted).

Finally, within the context of a § 1983 action and a qualified-immunity defense, the threshold for reasonable suspicion is lowered. Specifically, an officer "is entitled to qualified immunity if a reasonable officer could have believed that [reasonable suspicion] existed to . . . detain the plaintiff—i.e., if the officer had arguable reasonable suspicion." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008) (internal quotation marks omitted).

13

### C.    Shaws' Action Against Trooper Schulte

We view the Shaws' Action and Trooper Schulte's motion for summary judgment as having two parts: (1) the initial prolongation of the stop for a K-9 sweep and (2) the prolongation of the stop after the dog alert. We discuss each in turn.

### 1.    Initial Prolongation of Stop for K-9 Sweep

On appeal, Trooper Schulte argues six factors supported arguable reasonable suspicion for extending the stop of the Shaws: (1) Blaine failed to promptly pull over; (2) the Shaws were traveling to Denver; (3) the minivan was not registered in Blaine's name; (4) Blaine had a prior arrest for drug trafficking; (5) the minivan had a "lived-in" look; (6) Samuel acted in a nervous and suspicious manner. We start our analysis with the final two factors.

While an officer's experience that drug traffickers travel in vehicles in which they live and the nervousness of an occupant in a vehicle may count toward the reasonable suspicion calculus,[6] we may consider these factors at the interlocutory appeal stage only if a reasonable jury would necessarily need to adopt the veracity of Trooper Schulte's purported observations. Such is not the case here because the Shaws have advanced evidence disputing the accuracy of Trooper Schulte's

---

[6] *See, e.g.*, *United States v. Hernandez-Lizardi*, 530 F. App'x 676, 680–81 (10th Cir. 2013) (unpublished) (concluding a display of nervousness by a passenger can be a consideration in the reasonable suspicion calculus); *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) ("[N]ervousness is a common, natural reaction during a traffic stop, and thus only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion" such that, normally, nervousness will only "contribute marginally to a reasonable suspicion of illegal activity.").

observations. The Shaws' evidence is in the form of their own affidavits, as well as other evidence in the record—including Trooper Schulte's reaction to Blaine's refusal of consent to search and Trooper Schulte's questionable claim that he "found it suspicious that B. Shaw claimed to be a criminal justice major at his age and that he would refuse a search if he were a criminal justice major." App. Vol. 2 at 84. This evidence would permit a reasonable jury to find the facts in favor of the Shaws and to question Trooper Schulte's credibility. Accordingly, while it may be appropriate to consider these factors as part of the reasonable suspicion calculus at a later stage in these proceedings, it is not appropriate to do so at this stage.

Turning to the amount of time it took Blaine to stop, we assign this factor minimal value given the circumstances of the stop. To be sure, we have frequently concluded that an individual's failure to promptly stop in response to a police officer attempting to conduct a traffic stop supports reasonable suspicion of criminal activity beyond a mere traffic violation. *United States v. Ludwig*, 641 F.3d 1243, 1248 (10th Cir. 2011); *United States v. Fernandez*, 18 F.3d 874, 878–79 (10th Cir. 1994) (collecting cases). However, the reasonable-suspicion calculus is fact specific and based on common sense. *United States v. Gaines*, 918 F.3d 793, 802 (10th Cir. 2019); *Walraven*, 892 F.2d at 975. Thus, the degree to which a driver's failure to promptly stop supports reasonable suspicion will vary depending on the circumstances of the stop. Like the district court, we consider the nature of the traffic stop here unusual in that Trooper Schulte was traveling the same direction as Blaine, let other cars pass him, activated his lights and siren *before* Blaine passed him, and did little to clarify

15

the initial ambiguity of whether he intended to stop Blaine. Indeed, for twenty seconds, he followed Blaine at a consistent distance of four to five center-dividing dash-lines rather than closing the distance between his patrol vehicle and the minivan. Accordingly, while a reasonable officer could have concluded Blaine was slow to stop, the weight due to this factor is minimal where, as the district court noted "I don't know one person in a thousand that would think they're supposed to stop," under these facts. Supp. App. at 62.

Turning to the Shaws' destination and the vehicle registration, we conclude both factors have minimal value. Circuit precedent identifies Denver as a "known drug source area" such that an individual's intended travel to Denver can add to the reasonable suspicion calculus. *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001). But our case law also recognizes that many areas have been labeled "known drug source area[s]," including "the entire West Coast," all of Colorado, California, Texas, and "a significant number of the largest cities in the United States." *Id.* Thus, where it would be difficult to take a road trip without driving toward, through, or from a "known drug source area," this consideration is due extremely minimal weight.[7] *See Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir.

---

[7] This is particularly true where the stop occurred in western Kansas on I-70 westbound, an interstate which largely traverses across farmland and relatively empty foothills before reaching Denver. This is to say, a significant percentage of motorists traveling I-70 westbound in the area where Trooper Schulte stopped Blaine are traveling to or through Denver such that common sense defeats placing any meaningful weight on the Shaws' travel plans.

2016) ("[T]hat the defendant was traveling from a drug source city . . . does little to add to the overall calculus of suspicion.").

We have likewise concluded that a vehicle not being registered to a driver is a factor supporting reasonable suspicion of drug trafficking. *Ludwig*, 641 F.3d at 1249. But we reached that conclusion where both the vehicle registration *and* insurance were in the name of a third party. *Id.* at 1246. Here, while the vehicle registration was not in Blaine's name, Trooper Schulte possessed paperwork showing that Blaine was named as an insured on the vehicle's policy. Furthermore, the vehicle was registered to Blaine's father, not an individual with no clear and obvious connection to Blaine and Samuel. Accordingly, given the facts known to Trooper Schulte at the time he extended the traffic stop, common sense dictates that very little weight is due to the vehicle registration in the reasonable suspicion calculus.

Thus, so far in our analysis, the only factors properly considered at summary judgment are of minimal or very minimal value. Still remaining, however, is Blaine's prior drug trafficking arrest. There is no dispute that "[a] previous criminal history may also weigh in favor of an officer's reasonable suspicion of illegal activity." *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011). But, "[a]n individual's criminal record, by itself, is not a sufficient basis for reasonable suspicion." *Id*. To that point, "[e]ven people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches." *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005). Here, while Blaine did have a prior drug trafficking arrest, the arrest occurred nearly ten years prior to the traffic stop.

17

When this passage of time is combined with the minimal value attributed to the other factors identified by Trooper Schulte that are free from any disputes of fact, Trooper Schulte has not amassed factors supporting arguable reasonable suspicion as a matter of law. *See Vasquez*, 834 F.3d at 1136–37 (holding lack of reasonable suspicion based on travel from known drug source area/Denver area, insurance not matching vehicle driven, items in vehicle suggestive of driver sleeping in vehicle, and driver acting nervous during the stop). Put another way, considering the totality of the circumstances, Trooper Schulte has not advanced sufficient undisputed facts establishing arguable reasonable suspicion to prolong the stop of the Shaws. Furthermore, the undisputed facts, including the minimal weight given to the factors not in dispute, are sufficiently similar to *Vasquez* to permit the Shaws to overcome the clearly established prong of qualified immunity for purposes of this stage of the proceedings. Therefore, we affirm the district court's denial of Trooper Schulte's motion for summary judgment relative to the time between when Blaine refused consent and the dog alerted while sweeping the minivan. As discussed next, however, we reach a different conclusion regarding the Shaws' ability to proceed on their claim relative to the period of time after the dog alerted.

2.    **Prolongation of Stop after Dog Alert**

Trooper Schulte argues that even if disputed material issues of fact surround whether he had reasonable suspicion for prolonging the stop, we should limit the Shaws' claim to the period between when he called for the K-9 unit and when the dog alerted because the exclusionary rule and the fruit of the poisonous tree doctrine do

not apply within the context of a § 1983 action. The district court never passed judgment on this argument and the Shaws do not respond to the argument on appeal.

A dog alerting during a sweep of a vehicle provides officers with probable cause to search the vehicle. *See United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) (collecting cases and stating, "the general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause"). Under the fruit-of-the-poisonous-tree doctrine and within the context of a motion to suppress in a criminal case, the dog's alert would not save the proceeds of the search if Trooper Schulte lacked reasonable suspicion to further detain the Shaws while waiting for the K-9 unit to arrive. *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015). But the fruit-of-the-poisonous-tree doctrine rests in the exclusionary rule's deterrent purposes. *See Nix v. Williams*, 467 U.S. 431, 442–43 (1984) ("The core rationale consistently advanced . . . for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections."). And while it is true that § 1983 actions "serve as a deterrent against future constitutional deprivations," *Owen v. City of Independence*, 445 U.S. 622, 651 (1980), it is generally recognized that (1) the further removed in time a consequence is from an officer's action, the less of a deterrent impact; and (2) application of the exclusionary rule outside the direct criminal context has decreasing deterrent impact, *Stone v. Powell*, 428 U.S. 465, 487–88 (1976).

Considering the marginal deterrent effect of applying the exclusionary rule within the § 1983 context with the fact that not applying the rule would merely truncate the scope of a § 1983 action but not bar pursuit of the action, we agree with the seeming consensus in our sibling circuits that the exclusionary rule and fruit-of-the-poisonous-tree doctrine do not apply in the § 1983 context. *See Martin v. Marinez*, 934 F.3d 594, 599 (7th Cir. 2019) ("[T]he fact that the evidence was the fruit of an illegal detention does not make it any less relevant to establishing probable cause for the arrest because the exclusionary rule does not apply in a civil suit under § 1983 against police officers."); *Lingo v. City of Salem*, 832 F.3d 953, 960 (9th Cir. 2016) ("Once again, the federal courts of appeals that have considered this issue appear to be in accord: 'The lack of probable cause to search does not vitiate the probable cause to arrest' on the basis of evidence found in that search." (quoting *Townes v. City of N.Y.*, 176 F.3d 148, 149 (2d Cir. 1999) (ellipsis omitted))); *Black v. Wigington*, 811 F.3d 1259, 1268 (11th Cir. 2016) ("We now join our sister circuits and hold that the exclusionary rule does not apply in a civil suit against police officers. The cost of applying the exclusionary rule in this context is significant . . . . And the deterrence benefits are miniscule."); *see also Hector v. Watt*, 235 F.3d 154, 156–57 (3d Cir. 2000) (concluding § 1983 plaintiff could not advance claim dependent on exclusionary rule because § 1983 adopted common-law tort principles but the exclusionary rule was not part of the common law). Accordingly, Trooper Schulte is entitled to summary judgment on the portion of the Shaws' action seeking damages for their detention subsequent to the dog alert.

### D.    *Mr. Bosire's Action Against Trooper McMillan and Trooper Schulte*

### 1.    Claim Against Trooper McMillan

On appeal, Trooper McMillan argues six factors support arguable reasonable suspicion: (1) the cameras in Mr. Bosire's vehicle and his experience that they are associated with caravanning; (2) Mr. Bosire was driving a rental vehicle with a short-term contract; (3) Mr. Bosire had not rolled his window very far down before Trooper McMillan approached the vehicle; (4) Mr. Bosire provided dishonest answers about talking with the white man at the Love's; (5) associating the smell of marihuana at the Love's with Mr. Bosire; and (6) his belief that Mr. Bosire was caravanning with the Dodge Charger. As a starting point, we reject Trooper McMillan's reliance on the final three factors, at least at this stage of the proceedings.

On the final two factors, as recognized by the district court, Trooper McMillan's declaration is lacking in coherence, paints an incomplete picture, and would permit a reasonable jury to find Trooper McMillan incredible on these matters. Regarding the marihuana smell, the declaration suggests Trooper McMillan exited the Love's, smelled marihuana, looked around for up to five minutes, saw Mr. Bosire and a white man talking near a gas pump, and leaped to the conclusion that Mr. Bosire and the white man may have been the source of the marihuana. This series of events does not even support a reasonable hunch that Mr. Bosire was the source of the marihuana smell. And, even if Trooper McMillan could establish a reasonable basis for initially connecting the smell to Mr. Bosire, Trooper McMillan's attempt to

21

rely on it in support of the ultimate reasonable suspicion determination is undermined where Trooper McMillan, prior to calling for the K-9 unit, interacted with Mr. Bosire and acknowledges he "could not smell marijuana on Mr. Bosire or in Mr. Bosire's vehicle." App. Vol. 2 at 173.

Trooper McMillan's attempt to rely on the allegation that Mr. Bosire was caravanning with a Dodge Charger suffers from similar deficiencies. The declaration offered by Trooper McMillan does not place (1) the Dodge Charger in the Love's parking lot, (2) Mr. Bosire anywhere near the Dodge Charger; or (3) the white man anywhere near the Dodge Charger. Further, Trooper McMillan's alleged suspicion that Mr. Bosire was caravanning with the Dodge Charger is curious where, at least from his declaration, it does not appear Trooper McMillan observed where the Dodge Charger went, or whether it ever entered I-70 eastbound, the direction in which both Trooper McMillan and Mr. Bosire traveled. More perplexing, although Trooper McMillan attempts to associate the Dodge Charger with the white man at the Love's suggesting one driver in each of two cars, Trooper McMillan expressed some surprise that when he stopped Mr. Bosire the white man was not in the Altima. *See id.* at 168 (Trooper McMillan declaring that when he approached the Altima he "did not know how many occupants were in the vehicle or their race"); *id.* at 173 (Trooper McMillan declaring that "I also radioed Schulte that the white man seen at the convenience store is 'no longer in the car'"). Trooper McMillan's expectation that the white man might be traveling in the Altima is inconsistent with the white man operating the Dodge Charger and caravanning with Mr. Bosire. Where, on this

22

record, there is no reasonable basis to believe the Altima and the Dodge Charger were caravanning, a reasonable jury could reject that ground for the extension of the traffic stop and also question the credibility and the veracity of Trooper McMillan's other alleged observations.

Next, as to the nature of Mr. Bosire's responses to Trooper McMillan's questions about the white man at the Love's, we conclude a dispute of fact exists. This exchange occurred after Mr. Bosire sought to invoke his right to silence during the first exchange. *Cf. United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) ("Though [questions about travel plans] do typically fall within the scope of a traffic stop, citizens' legitimate privacy interests are protected in that they are not legally obligated to answer such questions, nor can an officer compel an answer to these routine questions."). And Mr. Bosire again sought to invoke his right to silence during the exchange about the white man at Love's. Thus, while a jury might find that Trooper McMillan reasonably viewed Mr. Bosire's responses as dishonest, it also might find that Mr. Bosire sought to invoke his constitutional right to silence and avoid additional verbal interaction with Trooper McMillan.

The remaining three factors offered by Trooper McMillan do not amount to arguable reasonable suspicion. On the rental car, we have "suggested that the use of a rental car can potentially contribute to an officer's reasonable suspicion of drug trafficking." *Kitchell*, 653 F.3d at 1221. But, where there is no discrepancy between the rental contract and the suspect's travel, the factor receives "little weight." *Id.* Here, the rental vehicle was due earlier in the day of the traffic stop but Mr. Bosire

23

was traveling in the direction of where he was scheduled to return the rental car. Accordingly, while the rental nature of the Altima may be of slightly more than "little weight," it remains a relatively unpersuasive factor.

Next, as to the window, we have concluded that a driver's "odd use of his window can contribute to reasonable suspicion." *United States v. Ahmed*, 825 F. App'x 589, 592 (10th Cir. 2020) (unpublished); *see also United States v. Ludlow*, 992 F.2d 260, 264 (10th Cir. 1993) (failure of driver to roll down window all the way could raise suspicion driver was trying to hide an odor). But a reasonable jury might not find Mr. Bosire's use of his window at all "odd." Although Mr. Bosire did not lower his window more than a crack before Trooper McMillan approached the vehicle, he did lower the window partially upon Trooper McMillan's request for his license and the rental agreement. Further, the stop occurred on a winter night in rural Kansas. Given likely weather conditions, it is unsurprising that a stopped motorist would wait for an officer to approach to further lower his window. Finally, Trooper McMillan's concern that Mr. Bosire was attempting to hide something by not lowering the window is counteracted by his own observation that he did not smell any marihuana coming from Mr. Bosire or the vehicle and his apparent ability to see into the vehicle where he spotted the cameras and a notebook partially covered by a blanket.[8] Accordingly, viewing the facts in the light most favorable to Mr. Bosire, as

---

[8] Trooper McMillan also attempts to rely on his observation of the notebook as a factor in support of reasonable suspicion, contending that in his experience drug traffickers keep ledgers of their sales. Opening Br. at 13, 54. It is hardly uncommon for an individual to have a notebook in his vehicle. And Trooper McMillan does not

we must at this stage of the proceedings, Mr. Bosire's use of his window carries little value in the reasonable-suspicion calculus.

Lastly, Trooper McMillan relies upon the presence of cameras in Mr. Bosire's vehicle and his experience that they are associated with caravanning. In the context of a home, we have concluded the presence of surveillance cameras, when combined with other evidence of the drug trade, supports reasonable suspicion. *United States v. Murphy*, 901 F.3d 1185, 1192 (10th Cir. 2018). But, here, Trooper McMillan has not identified any other undisputed evidence of the drug trade in connection with Mr. Bosire. Accordingly, while the presence of cameras in the Altima is a consideration in support of reasonable suspicion, it is not sufficient to meet the arguable reasonable-suspicion threshold even when combined with the other factors properly before us at the summary-judgment stage. Put another way, considering the totality of the circumstances, Trooper McMillan has not advanced sufficient undisputed fact to establish arguable reasonable suspicion in support of his decision to prolong the stop of Mr. Bosire. And, given the minimal value of the factors properly before us when the evidence is viewed in the light most favorable to Mr. Bosire, we conclude it so obvious that reasonable suspicion was lacking as to

present any observations about the notebook, such as a title on the book or seeing dates and transactions listed on a page of the notebook, supporting the proposition that the notebook was a drug-sale ledger. Nor is Trooper McMillan's hunch that the notebook was a drug ledger particularly consistent with his belief that Mr. Bosire was not the primary drug-trafficker and was driving the vehicle to distract police attention. Thus, Trooper McMillan's observation of the notebook, if of any value in the reasonable suspicion calculus, is of minimal value.

permit Mr. Bosire to overcome Trooper McMillan's assertion of qualified immunity at this stage of the proceedings.[9] Therefore, we affirm the district court's denial of Trooper McMillan's motion for summary judgment.

**2.    Claim Against Trooper Schulte**

We, however, reach a different conclusion regarding Mr. Bosire's claim against Trooper Schulte. The undisputed facts do not support the proposition that Trooper Schulte was part of the decision-making process in prolonging the stop of Mr. Bosire for a K-9 sweep.[10] In fact, Mr. Bosire's theory for his claim is that Trooper Schulte had a duty to intervene and dissuade Trooper McMillan from holding Mr. Bosire until the K-9 unit arrived. In support of this theory and the viability of his claim against Trooper Schulte, Mr. Bosire cites *Vondrak* for the general proposition "that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." 535 F.3d at 1210 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). But we made this statement in the context of an excessive force claim. *Id*. And where the intrusion and permanency of harm

---

[9] In concluding Trooper McMillan obviously lacked reasonable suspicion under the facts we must assume for purposes of summary judgment, we observe that, although not bound to view the facts in a light most favorable to Mr. Bosire, a KHP investigation concluded (1) "there was not reason to detain Mr. Bosire further for a K-9 unit to respond to the scene" and (2) Trooper McMillan "h[e]ld Mr. Bosire for a longer duration than is legally acceptable." App. Vol. 3 at 158.

[10] To the extent Trooper Schulte was the officer who called dispatch for a K-9 unit, he did so upon Trooper McMillan's request and after Trooper McMillan decided to extend the traffic stop rather than giving Mr. Bosire the speeding warning and permitting him to go on his way.

from the use of excessive force may exceed that from the relatively brief prolongation of a traffic stop, *Vondrak* does not clearly establish that an officer must intervene to prevent an illegal search and seizure. Accordingly, Mr. Bosire has not overcome the second prong of Trooper Schulte's qualified-immunity defense. Therefore, we reverse the district court's denial of Trooper Schulte's motion for summary judgment as to Mr. Bosire's claim.

## IV.   CONCLUSION

We AFFIRM IN PART and REVERSE IN PART. The Shaws may proceed on their § 1983 action against Trooper Schulte but Trooper Schulte is entitled to partial summary judgment regarding the scope of the Shaws' action. Additionally, while Mr. Bosire may proceed on his § 1983 action against Trooper McMillan, Trooper Schulte is entitled to qualified immunity as to Mr. Bosire's action.