FILED
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DAVID ASHARD SAMILTON,

    Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DAVID ASHARD SAMILTON,

    Defendant - Appellant.

_____

Nos. 21-6149
(D.C. No. 5:13-CR-00231-F-1)
(W.D. Okla.)

No. 21-6150
(D.C. No. 5:20-CR-00284-F-1)
(W.D. Okla.)

Submitted on the briefs:[*]

Susan M. Otto, Federal Public Defender and Laura K. Deskin, Research & Writing Specialist, Oklahoma City, Oklahoma, on the brief for Defendant – Appellant.

Robert J. Troester, U.S. Attorney and David R. Nichols, Jr, Assistant U.S. Attorney, Oklahoma City, Oklahoma, on brief for Plaintiff – Appellee.

_____

   [*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.

_____

Before **MATHESON**, **CARSON**, and **ROSSMAN**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Patrol Sergeant Mark Garrett seized a firearm from underneath David Samilton's passenger seat during a vehicle stop. Based on the firearm, (1) a jury convicted Mr. Samilton of being a felon in possession, and (2) the district court revoked his supervised release in an unrelated case. On appeal in both cases, Mr. Samilton challenges the district court's denial of his motion to suppress the firearm.[1] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual History*[2]

On September 13, 2020, the Oklahoma City Police Department received a 911 call from a Rodeway Inn hotel clerk. The clerk said a four-door, dark-colored car had been in the parking lot for several hours, and a Black female driver and a white, bearded male passenger were sitting inside. The clerk also said the man had a

---

[1] Mr. Samilton and the Government each filed identical briefs in both cases. *See* Case Nos. 21-6149; 21-6150. Because the record is more comprehensive in Case No. 21-6150, we cite to the record in that case.

[2] Because Mr. Samilton appeals the denial of his motion to suppress, we state the facts in the light most favorable to the district court's decision. *See United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020).

"pistol[] in his hand and was waving it around inside the car," ROA, Vol. III at 10, and had been knocking on hotel room doors. The clerk did not believe the man was a hotel guest.

Sergeant Garrett and several other officers[3] were dispatched to the scene. At the suppression hearing, Sergeant Garrett said the Rodeway Inn was located in a high crime area. When he worked there, he sometimes encountered three to five armed robberies per week. The 911 caller's report about the male passenger's open display of a firearm "[wa]s very uncommon" and troubling to him. *Id*. at 13.

1. **Initial Search**

When Sergeant Garrett arrived, he found a black sedan in the hotel parking lot with a Black female driver and a bearded male passenger.[4] He activated his body camera and approached the sedan. Bodycam footage at 00:08-00:33. While walking toward the car, he observed the passenger make "furtive movements . . . towards the floorboard area towards his knees, multiple hand movements [sic]," which he interpreted as "trying to hide a firearm." ROA, Vol. III at 22. He also heard a noise that sounded "like a firearm or a magazine that goes into a firearm had been thrown from the vehicle and hit the pavement." *Id*. at 19.

---

[3] In its findings of fact, the district court observed that although Sergeant Garrett "was not the only officer involved, . . . he was certainly, by any standard, the principal officer involved." ROA, Vol. I at 61. Sergeant Garrett conducted the search that found the gun.

[4] The only discrepancy from the 911 caller's report was that Mr. Samilton is Black.

Sergeant Garrett opened the passenger door and asked what had been tossed out the window. Bodycam footage at 00:42-00:44. The passenger denied tossing anything, *id*. at 00:44-00:46, and showed Sergeant Garrett a hotel room key and his driver's license, *id.* at 01:26-01:29, which identified him as David Samilton. When Sergeant Garrett asked whether he had any guns, Mr. Samilton said no. *Id*. at 01:29-01:31. After receiving consent, Sergeant Garrett frisked Mr. Samilton but did not find a weapon. *Id*. at 01:33-01:54. Sergeant Garrett then walked Mr. Samilton to his police vehicle and directed him to sit in the back seat. *Id*. at 02:08-02:40.

In the police vehicle, Sergeant Garrett asked Mr. Samilton whether there was a gun in the sedan. *Id.* at 02:50-51. Mr. Samilton gave evasive responses—he said "you checked me" and "I don't have no gun," but avoided stating directly whether there was a gun in the vehicle. Bodycam footage at 02:52-03:05. Finally, Sergeant Garrett said: "[L]isten to the question I'm asking. Is there a gun inside that car?" *Id*. at 03:08-03:13. Mr. Samilton responded, "no, not to my knowledge." *Id*. at 03:12-03:14.

Sergeant Garrett testified that this interaction made him suspicious. In his experience,[5] individuals who are authorized to carry firearms will freely disclose the presence of a firearm, but individuals who carry firearms illegally often refuse to

---

[5] Sergeant Garrett testified that he had almost a decade of law enforcement experience.

admit the presence of a firearm and "separate[] themselves from wherever the gun is." ROA, Vol. III at 21-22.

After leaving Mr. Samilton in the police vehicle, Sergeant Garrett returned to the sedan and asked the female driver whether there was a gun in the car. Bodycam footage at 03:32-03:33. After prevaricating, she said there was a gun "on the right side of the door," referring to the passenger side of the car. Bodycam footage at 04:13-04:17. Sergeant Garrett asked if he could look in the car, and the driver said, "I don't care." *Id*. at 04:20-04:22. Sergeant Garrett then examined the area near the passenger seat and promptly found a live 9-millimeter round on the floor. *See* ROA, Vol. III at 26-27. For the next several minutes, Sergeant Garrett inspected the passenger seat and the area outside the sedan. *See* bodycam footage at 04:22-05:55. He found no gun.

2. **Extended Search**

Sergeant Garrett next walked back to the police vehicle and asked Mr. Samilton where he tossed the gun. *Id*. at 06:03-06:06. Mr. Samilton again denied disposing of a gun. *Id*. at 06:07-06:21. Sergeant Garrett continued inspecting the area around the sedan and the interior of the car. *Id*. at 06:31-08:06.

About eight minutes into the stop, Sergeant Garrett returned to the police vehicle, placed Mr. Samilton in handcuffs, and frisked him again, but did not find a firearm. *Id*. at 08:16-10:04. More searching ensued as Sergeant Garrett once again examined the interior of the sedan and the surrounding area. *Id*. at 10:50-12:30.

5

After again finding no firearm, Sergeant Garrett began to enter Mr. Samilton's and his female companion's information into a police database. *Id*. at 12:43. He also asked Mr. Samilton whether he was a felon, and Mr. Samilton confirmed that he was. *Id*. at 12:49-52.

### 3. Final Search

After he finished entering Mr. Samilton's information, about nineteen minutes into the stop, Sergeant Garrett resumed searching for the firearm. *Id*. at 18:59. Shortly thereafter, Sergeant Garrett found a firearm that had been concealed under the passenger seat of the sedan. *Id*. at 19:34-19:55.

### B. *Procedural History*

A grand jury indicted Mr. Samilton for being a felon in possession of a firearm. He filed a motion to suppress the firearm, arguing that Sergeant Garrett had unreasonably prolonged the traffic stop in violation of the Fourth Amendment.[6] After holding a hearing, the district court concluded that (1) the traffic stop was justified at its inception and (2) reasonable suspicion supported Sergeant Garrett's decision to extend the stop. The court also found no factual nexus between Mr. Samilton's detention and the seizure of the firearm. It explained that the sedan

---

[6] Mr. Samilton also moved to suppress the statements he made to Sergeant Garrett before Sergeant Garrett issued any *Miranda* warnings, and the district court suppressed those statements. *See* Aplt. Br. at 16-17. But the fruits of un-*Mirandized* statements are not per se inadmissible, *see United States v. Patane*, 542 U.S. 630, 639 (2014), and Mr. Samilton does not raise a *Miranda* issue on appeal. Aplt. Br. at 16-17.

belonged to the female driver, who consented to the search, so the discovery of the firearm did not result from any alleged violation of Mr. Samilton's rights. The court thus denied Mr. Samilton's motion to suppress the firearm.

The case proceeded to trial, and the jury found Mr. Samilton guilty. The district court sentenced Mr. Samilton to 120 months in prison. The court also revoked his supervised release term on an unrelated offense and imposed an additional 14-month sentence.

## II. **DISCUSSION**

The timeline of Sergeant Garrett's interactions with Mr. Samilton can be divided into three distinct periods, as measured by the bodycam timestamps:

1. **Initial search**, 00:00 to 05:55—Sergeant Garrett's first encounter with Mr. Samilton and initial search of the vehicle and surrounding area.

2. **Extended search**, 05:55 to 12:52—Sergeant Garrett's repeated searches of Mr. Samilton's person, the vehicle, and the surrounding area until he learned Mr. Samilton was a felon.

3. **Final search**, 12:52-19:49—Sergeant Garrett's communications with dispatch and further searches until he found the firearm.

Mr. Samilton does not dispute that reasonable suspicion supported the initial search and the final search. Aplt. Br. at 15-16. He thus focuses on the extended search period, the approximately seven-minute window between (1) Sergeant Garrett's concluding his initial search of the sedan and surrounding area, and (2) his learning that Mr. Samilton was a felon. *Id*.; bodycam footage at 05:55-12:52.

Mr. Samilton argues that after Sergeant Garrett's initial search failed to produce a firearm, "any reasonable suspicion that criminal activity was afoot had

7

dissipated." Aplt. Br. at 13.[7] "Once officers found no firearm after a thorough search," Mr. Samilton contends, "he should have been permitted to go on his way." *Id.* at 17. He argues the district court thereby erred in denying his motion to suppress the firearm. *Id.* at 14.

## A. *Standard of Review*

"In reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous . . . ." *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018). In conducting our review, we "view the evidence in the light most favorable to the determination of the district court." *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) (quotations omitted).

## B. *Legal Background*

### 1. Investigative Detentions

The Fourth Amendment protects individuals from unreasonable seizures. U.S. Const. amend. IV.[8] Evidence collected as part of an unconstitutional seizure is thus generally inadmissible. *See Terry v. Ohio*, 392 U.S. 1, 29 (1968).

"This court has recognized three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment;

---

[7] Because Mr. Samilton's brief does not contain internal pagination, we count page numbers from the beginning of the document.

[8] Through its incorporation in the Fourteenth Amendment, the Fourth Amendment applies to searches and seizures conducted by state officers. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

(2) investigative detentions which are Fourth Amendment seizures of limited scope

and duration and must be supported by a reasonable suspicion of criminal activity;

and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only

if supported by probable cause." *Hammond*, 890 F.3d at 904 (quotations omitted).

The second category—investigative detentions, commonly known as *Terry*

stops—includes detention of individuals in vehicles.  To be constitutional, the

detention must be reasonable as to both the driver and any passengers.  *United States

v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).[9]  Thus, although "a

defendant may lack the requisite possessory or ownership interest in a vehicle to

directly challenge a search of that vehicle, the defendant may nonetheless contest the

lawfulness of his own detention and seek to suppress evidence found in the vehicle as

the fruit of the illegal detention." *Id*.

A *Terry* stop is constitutional if "the stop was justified at its inception" and

"the officer's actions during the detention were reasonably related in scope to the

circumstances which justified the interference in the first place." *Vasquez v. Lewis*,

834 F.3d 1132, 1136 (10th Cir. 2016) (quotations omitted).  A detention becomes

---

[9] Although the detention of the individuals in this case was not a routine highway traffic stop based on a traffic violation, both parties cite cases discussing *Terry* traffic stops in their briefs.  *E.g.*, Aplt. Br. at 14-15; Aplee. Br. at 16-17.  We have routinely applied *Terry* and its progeny to situations where suspects were detained in non-moving vehicles in parking lots.  In *United States v. Mosley*, for example, police received a report that two individuals had a gun in a vehicle in a parking lot.  743 F.3d 1317, 1321 (10th Cir. 2014).  Officers approached the car and detained the passengers.  *Id*. at 1321-22. We assessed the reasonableness of the detention and subsequent search under *Terry* stop principles.  *Id*. at 1328.

unconstitutional if it is unreasonably prolonged.  Valid *Terry* stops "must be temporary, lasting no longer than necessary to effectuate the purpose of the stop." *Id*.  If an officer "observes specific and articulable facts supporting a reasonable suspicion that [an occupant of the vehicle] is engaged in illegal activity," the officer may extend the stop beyond its initial scope.  *United States v. Cash*, 733 F.3d 1264, 1274 (10th Cir. 2013); *see also United States v. Lopez-Martinez*, 25 F.3d 1481, 1487 (10th Cir. 1994) (suspicious behavior by a vehicle's passenger can give rise to reasonable suspicion).

If we conclude that an officer had sufficient reasonable suspicion to extend a *Terry* stop, we must then "examine whether the [officer] diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly, during which time it was necessary to detain the defendant."  *United States v. Goebel*, 959 F.3d 1259, 1268 (10th Cir. 2020) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

2. **Reasonable Suspicion**

The Fourth Amendment permits a police officer to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. 1 at 30).  Although reasonable suspicion must be more than an "inchoate and unparticularized suspicion or hunch," *Alabama v. White*, 496 U.S. 325, 329 (1990) (quotations omitted), "it is not, and is not meant to be, an onerous standard," *Shaw v. Schulte*, 36 F.4th 1006, 1014

10

(10th Cir. 2022) (quotations omitted). "[T]he level of suspicion required is considerably less than proof by a preponderance of the evidence or that required for probable cause." *United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011) (quotations and alterations omitted).

"Reasonable suspicion is an objective standard," and we "inquire[ ], based on the totality of circumstances, whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Cash*, 733 F.3d at 1273 (quotations omitted). The detaining officer need only articulate "some minimal level of objective justification" for the detention. *Sokolow*, 490 U.S. at 7 (quotations omitted). Even if it is more likely that an individual is not involved in criminal activity, an officer still may have reasonable suspicion to stop and detain the individual. *See United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). "To satisfy the reasonable suspicion standard, an officer need not rule out the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (quotations omitted).

"Furtive movements, nervousness, and the fact that conduct occurs in an area known for criminal activity are all appropriate factors to consider in determining whether reasonable suspicion exists." *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009). So too are "vague, inconsistent or evasive answers" to an officer's logical questions. *United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010). And an officer's observation of a vehicle occupant "throwing an object out of the

11

[vehicle's] window" may also contribute to the totality of the circumstances giving rise to reasonable suspicion. *See United States v. Potter*, 218 F. App'x 809, 814 (10th Cir. 2007) (unpublished) (cited for persuasive value under Fed. R. App. P. 32.1; 10th Cir. R. 32.1(A)).[10]

## C. *Analysis*

Mr. Samilton asserts there was no reasonable suspicion that he was involved in criminal activity after Sergeant Garrett's initial search of the sedan and surrounding area failed to produce a firearm. Aplt. Br. at 15-16. He argues Sergeant Garrett unconstitutionally prolonged the *Terry* stop during the extended search between 05:55 and 12:52 on the bodycam footage. *Id.* We disagree and affirm.

1. **Reasonable Suspicion Developed During the Initial Search to Extend the Stop - 00:00 to 05:55**

When Sergeant Garrett first approached the sedan, he heard a noise that sounded like a gun or magazine hitting the pavement. He also saw Mr. Samilton

---

[10] Other circuits have held that someone throwing objects into or out of a vehicle can contribute to reasonable suspicion or probable cause. *See United States v. Christian*, 187 F.3d 663, 668 (D.C. Cir. 1999) (agreeing with the district court that reasonable suspicion exists when someone "throws something into a car" immediately upon seeing an officer in "an area notorious for drug selling and stolen property"); *Riley v. City of Montgomery*, 104 F.3d 1247, 1252 (11th Cir. 1997) (determining probable cause supported by, among other things, the car passenger "throwing things . . . out of the window of the car"); *United States v. Allen*, 675 F.2d 1373, 1383 (9th Cir. 1980) ("The reasonable suspicion to stop ripened into probable cause to search and arrest when the crew of [a ship] was observed throwing boxes of cargo overboard and when the [ship] failed to respond to further communications or to stop."). Here, Officer Garrett claims he heard, rather than saw, Mr. Samilton throw something out the window, which we view as a relevant part of the totality of the circumstances.

making furtive movements consistent with trying to hide something. From that moment, Sergeant Garrett had reason to suspect that Mr. Samilton had hidden something, either by stowing it within the sedan or discarding it outside. *See DeJear*, 552 F.3d at 1201 (furtive movements contribute to reasonable suspicion); *Potter*, 218 F. App'x at 814 (throwing an object out of a vehicle window contributes to reasonable suspicion). Given the 911 caller's report that the male passenger had a gun, Sergeant Garrett also had reasonable suspicion that Mr. Samilton had hidden a firearm.

Sergeant Garrett pursued this reasonable suspicion by frisking Mr. Samilton, questioning the driver about whether there was a gun in the car, and asking her permission to search the passenger side—actions which Mr. Samilton concedes were part of the initial, valid *Terry* stop. *See* Aplt. Br. at 15. Sergeant Garrett then had two additional reasons to believe there was a gun nearby: (1) the driver admitted there was a gun on the passenger side of the car, and (2) Sergeant Garrett found a live 9-millimeter round on the floor near the passenger seat, where Mr. Samilton had been sitting. Bodycam footage at 04:13-04:17; ROA, Vol. III at 26-27. These two facts further supported Sergeant Garrett's reasonable suspicion that Mr. Samilton had possessed and hidden a gun—either in the car or in the surrounding area.

Sergeant Garrett also had a reasonable suspicion based on several factors that Mr. Samilton's possession of the firearm constituted criminal activity.

First, the 911 caller had reported behavior consistent with criminal activity— the man from the sedan brandishing a gun and knocking on hotel room doors.

13

Moreover, violent crimes, including armed robberies, frequently occurred in the area surrounding the Rodeway Inn, reinforcing suspicions about criminal activity. *See DeJear*, 552 F.3d at 1200-01.

Second, Mr. Samilton's furtive actions suggesting he was trying to hide contraband were inconsistent with the behavior of a person who is permitted to carry a firearm.

Third, Mr. Samilton repeatedly gave evasive replies to Sergeant Garrett's questions about the firearm. For example, when Sergeant Garrett asked whether there was a gun in the sedan, Mr. Samilton said "you checked me" and "I don't have no gun" rather than responding directly to the question. Bodycam footage at 02:52-03:05. Mr. Samilton's apparent nervousness and "vague, inconsistent or evasive answers" contributed to Sergeant Garrett's reasonable suspicion. *Simpson*, 609 F.3d at 1150.

In sum, Sergeant Garrett "observe[d] specific and articulable facts supporting a reasonable suspicion" that Mr. Samilton had engaged in criminal activity by possessing the firearm, so he was entitled to extend the *Terry* stop beyond its initial scope. *Cash*, 733 F.3d at 1273.

## 2. The Extended Search Was Reasonable - 05:55 to 12:52

But this does not end the inquiry. We must also determine whether Sergeant Garrett unreasonably extended the *Terry* stop or failed to act diligently in the approximately seven minutes between when he concluded his initial search and when he learned that Mr. Samilton was a felon. *See Goebel*, 959 F.3d at 1268.

We conclude that Sergeant Garrett acted diligently and did not unreasonably extend the *Terry* stop.  As discussed, he had reason to believe there was a firearm in the sedan, in the area surrounding the sedan, or on Mr. Samilton's person.  Sergeant Garrett checked these places multiple times.  He inspected the interior of the sedan, focusing on the passenger seat, bodycam footage at 07:38-8:07, 10:49-11:14; he checked the area surrounding the sedan, looking where Mr. Samilton may have thrown the weapon from the passenger side window, *id*. at 06:27-7:37, 11:14-12:32; and he frisked Mr. Samilton to ensure the weapon was not on his person, *id*. at 09:43-10:05.  That Sergeant Garrett's efforts were unsuccessful during this time period does not mean he was not diligent.  He "accomplished a great deal in a relatively short time." *Goebel*, 959 F.3d at 1259 (a 17-minute detention was not unreasonably prolonged because officers used that time to conduct a diligent search); *United States v. Mayville*, 955 F.3d 825, 827 (10th Cir. 2020) (upholding a 19-minute *Terry* stop because it "did not exceed the time reasonably required to execute the tasks relevant to accomplishing the mission of the stop").

*   *   *   *

We conclude that (1) Sergeant Garrett's decision to extend the *Terry* stop after his initial search was based on a reasonable suspicion of criminal activity, and (2) Sergeant Garrett undertook reasonable and diligent efforts to confirm his suspicion.  The extension of the *Terry* stop therefore did not violate Mr. Samilton's

15

Fourth Amendment rights.[11]  The firearm was properly admitted as evidence at trial and also was a proper basis to revoke Mr. Samilton's supervised release.

### III. CONCLUSION

We affirm the district court's denial of Mr. Samilton's motion to suppress the firearm.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge

---

[11] In light of this conclusion, we need not determine whether the district court erred in its alternative holding that there was no factual nexus between Mr. Samilton's detention and the discovery of the firearm.