**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**April 2, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GIANNI MONTAY MINNERS, a/k/a The
Supreme, a/k/a Ganni Montay Minners,
a/k/a Ganni Monta Minners, a/k/a Gianni
Monta Minners, a/k/a Gianni Montriel
Minners, a/k/a Gianni Montiel Minners,
a/k/a Montay Fields,

    Defendant - Appellant.

No. 23-5066
(D.C. No. 4:22-CR-00214-GKF-1)
(N.D. Okla.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **BACHARACH**, **BALDOCK**, and **KELLY**, Circuit Judges.[**]

_____

Defendant-Appellant Gianni Montay Minners, upon a conditional plea of

guilty, was convicted of being a felon in possession of a firearm.  18 U.S.C.

§ 922(g)(1); I R. 92, 110–12.  He was sentenced to 27 months' imprisonment and two

years' supervised release.  I R. 110–12.  He appeals from the district court's denial of

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.

his motion to suppress evidence obtained from the search and seizure of his person. II R. 39.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## Background

On June 15, 2022, two officers approached Mr. Minners near the front entrance of the Savanna Landing Apartments ("Savanna Landing").  II R. 8, 13.  At a motion hearing, the arresting officer testified that the purpose of approaching Mr. Minners was to discuss two previous incidents involving Mr. Minners.  Id. at 11, 27.

The June 9 incident (six days earlier) was an armed confrontation involving Mr. Minners and other men near the entrance of Savanna Landing, where Mr. Minners was captured on video and in photographs holding a gun.  Id. at 8–9; I R. 51–53.  Officers received this information from an apartment security guard.  II R. 8.

The June 11 incident (four days earlier) involved a shooting at a liquor store located approximately four blocks from Savanna Landing, and officers believed that Mr. Minners was the target based on video footage.  Id. at 11–12.  Officers also discovered through police records that Mr. Minners was a certified member of the 107 Hoover gang and a convicted felon.  Id. at 10–11.

When officers approached Mr. Minners, it was around 5 pm and still light, and he was speaking with a group of five women seated in lawn chairs with a child present.  Id. at 12–14, 16–17.  Only one officer conversed with Mr. Minners and captured the interaction on his body camera.  When the officer exited his car and approached Mr. Minners, Mr. Minners was standing with his back to the officer.

Body-camera footage at 00:30–00:40.  The approaching officer asked, "What's up?  Are you Gianni?  What's your name, man?"  II R. 35.  When the officer got closer, Mr. Minners backed up a few steps towards the officer (still facing away) and gave the officer an ID card saying, "Here's my ID, if you need some."  Body-camera footage at 00:40–00:45.  Mr. Minners then leaned over to help a woman who had spilled a drink.  II R. 35.

The officer responded, "I just asked you if you were Gianni."  Mr. Minners replied, "Huh?" while still bent over.  Id.  The officer repeated his question.  Id. at 36.  Mr. Minners turned his head to the officer and said, "Gianni who?"  The officer asked, "Is that not your name?"  Mr. Minners: "No."  The officer: "All right.  Then why did you just hand me an ID with Gianni on it?"  Mr. Minners:  "Who?"  Id.

Mr. Minners was still leaned over.  The officer said, "Step back here, Gianni."  Mr. Minners replied, "yeah" and turned slightly toward the officer.  The officer then reached out and grabbed Mr. Minners's arm, and Mr. Minners responded, "I ain't doing nothing" and again "I ain't doing nothing, sir" as he pulled his arm away.  Id.; Body-camera footage at 01:00–01:09.  As relevant here, this was the moment Mr. Minners was seized for Fourth Amendment purposes.  The district court so held in an order supplementing its oral ruling.  I R. 80–82.

After the seizure, Mr. Minners turned away from the officer again.  When the officer tried once more to grab Mr. Minners, Mr. Minners ran from the officer and was eventually tackled and placed in handcuffs.  Body-camera footage at 01:10–02:00.  The officer searched Mr. Minners and located a firearm in his waistband.  Id.

3

at 02:25–02:32.

Mr. Minners moved to suppress the evidence obtained from the June 15 seizure because officers lacked reasonable suspicion. I R. 16–19. At the motion hearing, the arresting officer testified to his suspicion that Mr. Minners possessed a gun. II R. 8–19. Specifically, the officer testified that Mr. Minners was "blad[ing] away" from him — when asked what this meant, he explained that "blading" meant "not showing me the front of his person." Id. at 15–16. He also testified that he believed Mr. Minners standing next to a group of women and a child was a bad situation, and there was "a potential for hostages." Id. at 18. On cross-examination, the officer reiterated that "I just wanted to have a talk with [Mr. Minners] about the incidents." Id. at 27.

In an oral ruling, the district court denied the motion to suppress and found that the officer "had a particularized and objective basis for suspecting Mr. Minners of criminal activity, specifically possessing a firearm as a felon." Id. at 39. The district court accepted a conditional plea, id. at 50, and Mr. Minners now appeals from the denial of his suppression motion.

## Discussion

"When reviewing the district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's factual findings unless they are clearly erroneous." United States v. Grimmett, 439 F.3d 1263, 1268 (10th Cir. 2006). "The ultimate question of

4

reasonableness under the Fourth Amendment is a legal conclusion that we review de novo." Id.

The Fourth Amendment protects "against unreasonable searches and seizures[.]" U.S. Const. amend. IV.  An officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest." United States v. McHugh, 639 F.3d 1250, 1255 (10th Cir. 2011) (citations omitted).  An investigatory detention is warranted "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).  The detention must be "justified at its inception" by reasonable suspicion.  McHugh, 639 F.3d at 1255 & n.3 (citations omitted).  In this case, there is no dispute that Mr. Minners was detained when the officer directed Mr. Minners where to stand and grabbed his arm.  Aplt. Br. at 8; Aplee. Br. at 11; I R. 80–81.  Therefore, the sole issue before us is whether the officer had reasonable suspicion that criminal activity was afoot — here, possession of a weapon by a felon — to justify the investigatory detention.

Reasonable suspicion requires a "particularized and objective basis" that criminal activity is occurring, United States v. Cortez, 449 U.S. 411, 417–18 (1981), and more than an "inchoate and unparticularized suspicion or 'hunch.'" Sokolow, 490 U.S. at 7 (citation omitted).  The "level of suspicion [required] is considerably less than proof of wrongdoing by a preponderance of the evidence" and "less

5

demanding" than probable cause.  Id.  In evaluating reasonable suspicion, we consider the totality of the circumstances.  Id. at 8.  We do not evaluate and reject each factor in isolation, even if each factor alone could indicate innocent activity.  See United States v. Arvizu, 534 U.S. 266, 274 (2002).  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them[.]"  Id. at 273.  An officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  Whren v. United States, 517 U.S. 806, 813 (1996).

The district court relied upon the totality of circumstances to establish reasonable suspicion.  It mentioned: (1) Mr. Minners's possession of a gun as a felon six days earlier, (2) Savanna Landing's location in a high-crime area, (3) Mr. Minners's "furtive or evasive movements[,]" and (4) officers' knowledge that Mr. Minners was a gang member and the suspected target of a shooting four days earlier.  II R. 36–38.  Taken together, we agree that these facts provided an objective basis for officers to suspect that Mr. Minners possessed a gun as a felon on June 15.

**A. Mr. Minners's possession of a gun six days earlier**

Mr. Minners argues the officer's knowledge that he possessed a gun on June 9 cannot contribute to reasonable suspicion of gun possession on June 15 because the information was stale, and gun possession is "transitory or momentary" not ongoing.  Aplt. Br. at 10–11.  We disagree.

The staleness doctrine dictates that "[p]robable cause to search cannot be based on stale information that no longer suggests that the items sought will be found

6

in the place to be searched." United States v. Snow, 919 F.2d 1458, 1459 (10th Cir. 1990). As to reasonable suspicion, "timeliness of information is but one of many factors in the mix" and "the nature of the criminal activity at issue" factors in. United States v. Cortez-Galaviz, 495 F.3d 1203, 1209 (10th Cir. 2007). For example, timeliness is less relevant for criminal conduct that is ongoing and continuous (i.e., driving without a license, drug dealing, or conspiracy to commit fraud) and more relevant for transitory criminal conduct (i.e., jaywalking or mugging) which has a clear beginning and end point. Id.; see Snow, 919 F.2d at 1460 (evidence of conspiracy to defraud government collected over five-week period was not too stale given ongoing nature of crime); United States v. Mathis, 357 F.3d 1200, 1207 (10th Cir. 2004) (evidence of drug dealing dating back two years was not too stale given ongoing nature of crime).

Gun possession may fall somewhere in the middle of this scale. While gun possession could be transitory, it is not a crime like jaywalking, where entering and exiting the street clearly bookends the crime. Possession can also be actual or constructive. Viewing the evidence most favorably to the government, however, timeliness is less relevant, and a reasonable officer could certainly suspect that Mr. Minners still possessed a firearm as a felon.

Furthermore, only six days elapsed between the reported gun possession and the seizure. This court has held that an allegation of gun possession 17 days before a search did not render the information too stale to contribute to reasonable suspicion, given that "[i]t is reasonable to infer that one who brandishes a firearm will

7

intermittently possess that firearm for some period of time afterwards." United States v. Lazos, 314 F. App'x 127, 133 (10th Cir. 2009) (unpublished).  Obviously at some point, evidence of the June 9 gun possession might become too stale to contribute to reasonable suspicion of ongoing gun possession, but six days is not long enough.

Mr. Minners also argues that the officer approached him to discuss the recent incidents, not because the officer thought he had a gun, and therefore his detention was not justified at its inception.  Aplt. Br. at 11–12; see II R. 11, 13, 27.  But we look to objective facts to discern whether reasonable suspicion exists, not the officer's subjective intentions.  See Whren, 517 U.S. at 813.  Here, the objective facts available to the officer support reasonable suspicion of Mr. Minners's gun possession, which ends our inquiry.

**B. Mr. Minners's gang affiliation and involvement in a shooting four days earlier**

Mr. Minners's gang affiliation and involvement in a shooting four days before the seizure also support reasonable suspicion.  While "suspected gang affiliation — 'is not sufficient to create reasonable suspicion'" it is a part of the totality of the circumstances.  United States v. Hammond, 890 F.3d 901, 906–07 (10th Cir. 2018).  Mr. Minners argues that his reported gang affiliation should not contribute to reasonable suspicion because the reliability of the police department's certification process was vague and underexplained, Aplt. Br. at 12–15, but the reliability of the certification process is irrelevant to the reasonable suspicion calculus.  This evidence,

together with the reported gun possession six days earlier, and the fact that Mr. Minners was the alleged target of a shooting four days earlier, only strengthens the inference that Mr. Minners likely possessed a gun on June 15. It is reasonable to infer that anyone, let alone a gang member, would more likely possess a firearm if they were actively targeted.

**C. Location in high-crime area and actions when approached by police**

Finally, Mr. Minners's actions when approached by police in a high-crime area properly contributed to reasonable suspicion. Mr. Minners argues that (1) the district court mischaracterized his actions as furtive and that he did not "blade" away from officers by shielding his body, and (2) presence in a high-crime area is insufficient to establish reasonable suspicion. Aplt. Br. at 14–19.

First, it is debatable from the body-camera footage whether Mr. Minners was intentionally shielding the front of his body from police or otherwise simply ignoring the officer. But the footage clearly shows that Mr. Minners remained with his back to the officer throughout the entire interaction and gave inconsistent answers to the officer's questions — i.e., handing the officer an ID card with the name Gianni on it but saying his name was not Gianni. We have held that "vague, inconsistent or evasive answers" contribute to reasonable suspicion. United States v. Samilton, 56 F.4th 820, 828 (10th Cir. 2022) (citation omitted). While an individual is free to ignore police officers and "'furtive' movements alone" do not create reasonable suspicion, United States v. Humphrey, 409 F.2d 1055, 1059 (10th Cir. 1969); see United States v. Davis, 94 F.3d 1465, 1468–69 (10th Cir. 1996), we do not base our

9

finding of reasonable suspicion here on this behavior alone.  We consider Mr. Minners's actions alongside his gun possession six days earlier, that he had been shot at four days earlier, and that he was a reported gang member.

Second, the same logic applies to Mr. Minners's presence in a high-crime area. Even if it is not alone sufficient to support reasonable suspicion, see Illinois v. Wardlow, 528 U.S. 119, 124 (2000), we view it as a factor in the totality of the circumstances analysis that adds to reasonable suspicion.

**AFFIRMED.**

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge