**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

AJOHNTAE HAMMOND,

    Defendant - Appellant.

No. 17-1102

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CR-00201-RBJ-1)**
_____

Josh Lee, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender with him on the briefs) office of the Federal Public Defender, Denver, Colorado, appearing for the appellant.

James C. Murphy, Assistant United States Attorney (Robert C. Troyer, Acting United States Attorney with him on the brief) Office of the United States Attorney, Denver, Colorado, appearing for the appellee.
_____

Before **BRISCOE**, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

In 2016, two members of the Aurora Police Department pulled over a car in which Ajohntae Hammond was riding as the passenger in a busy intersection in Aurora, Colorado. The question we must decide in this appeal is whether the officers

had reasonable suspicion to believe Hammond was armed and dangerous to justify frisking him for weapons. The pat-down they conducted revealed a gun in Hammond's pocket and Hammond was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Based on information the officers gleaned from the department's Police Information Management System ("PIMS") prior to the pat-down that connected Hammond and the car to gang activity and weapons possession, along with the officers' observation that Hammond was wearing gang colors, we hold that the officers possessed reasonable suspicion to justify the pat-down search. Therefore, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM the district court's decision denying Hammond's motion to suppress the firearm.

## I. BACKGROUND

It was approximately 9:15 PM on the evening of March 16, 2016, when Officer Randall Ricks and his partner, Officer Jonathan McCants, pulled up behind a black Chevrolet Monte Carlo stopped at a red light. Noticing that the Monte Carlo had a brake light out, Officer Ricks ran a search for the vehicle's license plate in the PIMS. From this search Officer Ricks learned that the car had been seized in connection with a weapons possession case in mid-February of that year, and that an individual named Ajohntae Hammond had been arrested as part of that case. From there, Officer Ricks ran a PIMS search for Hammond, which revealed that in addition to his arrest for the weapons possession case mentioned in connection to the Monte Carlo, Hammond had also been listed as a suspect in a separate weapons possession

2

case, and had been flagged in the system as a documented gang member. At this point Officer McCants turned on his lights and sirens, and pulled over the Monte Carlo on the basis of the broken brake light.

The Monte Carlo pulled into a parking lot just past the intersection of South Chambers and East Alameda in Aurora, Colorado. At the district court Officer Ricks agreed that this was a "major" and "well-lit" intersection with several commercial businesses and apartment complexes, and that there was traffic traveling in both directions at the time of the stop. Aplt. App. Vol. III at 15–16. He added that while "the area itself" is one he paid "particular attention to" as a high-crime neighborhood, the intersection itself was not a high-crime area. Id. at 16. In fact the Aurora Police Department building is located at one corner of the intersection.

Officers Ricks and McCants then approached the Monte Carlo. While Officer McCants began to interact with the driver, Officer Ricks—with Hammond's name and criminal history in mind—knocked on the passenger window and asked that it be rolled down. The passenger, later identified as Hammond, opened the door and explained that the window did not roll down. Officer Ricks then asked for identification, and after first asking why Officer Ricks needed to see his identification, Hammond handed Ricks his ID, which confirmed that he was, in fact, Ajohntae Hammond.

It was at this point that Officer Ricks "decided that Mr. Hammond would be asked to step out of the vehicle and would be pat [sic] down for weapons." Id. at 11. According to Officer Ricks, he did so

3

> [b]ased on the fact that I had, prior to the stop, learned that Mr. Hammond had been arrested once for weapons possession, listed as an offender suspect in one case and was listed as a gang member. And through my training and experience, I know that gang members are often known to carry weapons on or about their person.

Id. at 11–12. Officer Ricks also noted that Hammond was wearing "clothing commonly worn by members of the Crip street gang," namely a "[g]ray and blue LA Dodgers hat, gray pants and gray shoes and a blue belt." Id. at 11.

At first, Hammond objected to Officer Ricks's request for him to exit the vehicle. He ultimately, however, calmly complied with the order when Officer McCants "interjected and told him, because he was a documented gang member, we wanted to make sure he didn't have any weapons on him." Id. at 13. As Hammond exited the Monte Carlo he continued to ask the officers questions, but was not aggressive in his tone. After Officer McCants joined him on the passenger side of the car, Officer Ricks conducted a pat-down search of Hammond, eventually discovering a loaded .32 caliber Beretta Tomcat in the front pocket of his sweatshirt.

After securing the weapon and placing Mr. Hammond under arrest, the officers confirmed that Hammond had a prior felony conviction. On this basis the government charged Hammond with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Hammond moved to suppress the gun as fruit of an illegal search. Specifically he argued that Officers Ricks and McCants did not have reasonable suspicion that he was armed and dangerous when they ordered him out of the car and conducted their pat-down search. After a suppression hearing the district court denied the motion,

4

and Hammond conditionally pled guilty, reserving the right to appeal the denial to this Court.

## II.    DISCUSSION

The Fourth Amendment protects persons against "unreasonable searches and seizures."  U.S. Const. amend. IV.[1]  This Court has recognized three types of police-citizen encounters: (1) "consensual encounters which do not implicate the Fourth Amendment"; (2) "investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity"; and (3) "arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause."  United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996) (internal quotations and citations omitted) ("Davis I").  The government does not argue that this encounter was consensual or that it was supported by probable cause.  We therefore treat the encounter here as an investigative detention.

During the "course of a valid investigative detention, an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous."  Id. at 1468 (citing United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1993)).  Here, Hammond does not challenge the validity of the original traffic stop, and so the question before us is whether Officers Ricks and McCants had reasonable suspicion that Hammond was armed and

---

[1] The Fourth Amendment is enforceable against the States through the Due Process Clause of the Fourteenth Amendment.  Mapp v. Ohio, 367 U.S. 643, 655 (1961).

dangerous at the time they decided to frisk him for weapons. In reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and review *de novo* the question of whether the search was reasonable under the Fourth Amendment. United States v. Davis, 636 F.3d 1281, 1288 (10th Cir. 2011) ("Davis II") (citing United States v. Gregoire, 425 F.3d 872, 875 (10th Cir. 2005)).

The reasonableness of a pat-down search during an investigative detention is governed by the Supreme Court's analysis in Terry v. Ohio, 392 U.S. 1 (1968). See, e.g., United States v. Garcia, 751 F.3d 1139, 1142 (10th Cir. 2014)) ("Garcia II"). In Terry, the Supreme Court held that a pat-down search, while brief, is a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." Terry, 392 U.S. at 17–18. The Court further held, however, that "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." Id. at 27. While the officer "need not be absolutely certain that the individual is armed," he must be sure that "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. When he possesses this reasonable suspicion, an officer is permitted to "conduct a carefully limited search of the [suspect's] outer clothing . . . in an attempt to discover weapons which might be used to assault him." Id. at 30.

6

The Terry analysis, while developed in reaction to encounters among police and pedestrians, also applies in the context of a traffic stop.  See, e.g., Arizona v. Johnson, 555 U.S. 323, 330 (2009).  Once a vehicle has been lawfully detained pursuant to a valid traffic stop, the officers may order the driver and passengers out of the car without violating the Fourth Amendment.  Id. at 331.  Further, an officer may perform a pat-down of a driver and any passengers "upon reasonable suspicion that they may be armed and dangerous."  Id. at 332 (quoting Knowles v. Iowa, 525 U.S. 113, 117-18 (1998)).  "While reasonable suspicion cannot be based on a 'mere hunch,' it also 'need not rise to the level required for probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.'" Davis II, 636 F.3d at 1291 (quoting United States v. Arvizu, 534 U.S. 266, 274(2002)).  The purpose of this pat-down, however, "is not to discover evidence of a crime, 'but to allow the officer to pursue his investigation without fear of violence.'" United States v. Manjarrez, 348 F.3d 881, 886–87 (10th Cir. 2003) (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).

In assessing whether officers have reasonable suspicion to effectuate this stop, courts look to the "totality of the circumstances" surrounding the interaction. Davis II, 636 F.3d at 1290.  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 1291 (quoting Arvizu, 534 U.S. at 273).

7

For example, in United States v. DeJear, 552 F.3d 1196, 1200–01 (10th Cir. 2009), this Court found reasonable suspicion for a Terry frisk notwithstanding the fact that when the officers originally approached the car containing the defendant the car was lawfully parked and they had no information illegal activity was occurring. There, after officers approached the vehicle, they noticed that the passengers were "in a very nervous state," and that one of the men in the backseat of the car was holding a baseball bat. Id. at 1198. The Court reasoned that these observations, combined with the vehicle's location in a high-crime neighborhood and the fact that the officers had recently observed individuals wearing gang colors parked outside the same house, were sufficient to establish reasonable suspicion that the suspect was armed and dangerous. Id. In other words, the officers' experiences during the interaction heightened their suspicion enough to meet the Terry standard.

The facts in this case also bear resemblance to those in Garcia II. There, a single officer pulled over a car on a "sparsely traveled avenue," and arrested the driver for driving with a suspended license. Garcia II, 751 F.3d at 1140. With the driver arrested, the officer was required to inventory the car, which meant the passenger needed to be removed from the vehicle. Id. Because the officer was alone, this entailed ordering the passenger out of the car and then necessarily turning his back on the passenger while conducting the search. See id. While ordering the passenger out of the car, the officer recognized him as Mr. Garcia, whom the officer had encountered two weeks prior. Id. During that first encounter the officer had arrested Mr. Garcia—whom he knew as a drug user with a criminal history—but Mr.

8

Garcia had been unarmed. Id. After recognizing Mr. Garcia upon ordering him out of the car, the officer also noticed that he was acting "nervous" and was "possibly hiding something." Id. at 1141.

On the basis of, (1) his previous encounter, (2) Garcia's criminal history, including an armed robbery felony, (3) a concern that the officer was alone and would have to turn his back on Mr. Garcia, (4) Mr. Garcia's nervousness, and (5) Mr. Garcia's history with drugs, the officer decided to conduct a pat-down for weapons. Id. at 1141. This Court held that, while any one of these facts alone would be insufficient to support reasonable suspicion, the totality of the circumstances meant the officer had reasonable suspicion that Garcia was armed and dangerous. Id. at 1148.

So too here. As did the officer in Garcia II, Officers Ricks and McCants possessed reasonable suspicion that Hammond was dangerous, and here that suspicion of dangerousness was inexorably linked to a concern about firearms. As a result of their PIMS search, the officers knew that Hammond had been arrested recently in connection with weapons possession, that he had previously been a suspect in another weapons case, and that he was listed as a suspected gang member, which the officers knew often suggested the presence of guns.

Standing alone, a criminal record—let alone arrests or suspected gang affiliation—"is not sufficient to create reasonable suspicion of anything[.]" United States v. Rice, 483 F.3d 1079, 1085 (10th Cir. 2007). Nor should it be. After all, "[i]f the law were otherwise, any person with any sort of criminal record—or even

9

worse, a person with arrests but no convictions—could be subjected to a <u>Terry</u>-type investigative stop by a law enforcement officer at any time[.]" <u>United States v. Sandoval</u>, 29 F.3d 537, 543 (10th Cir. 1994). Such a rule would offend the careful balance between individual liberty and public safety that is at the heart of the Fourth Amendment.

But where, as here, the circumstances of the stop itself interact with an individual's criminal history to trigger an officer's suspicions, that criminal history becomes critically relevant for <u>Terry</u>-purposes. <u>See, e.g.</u>, <u>United States v. Palmer</u>, 360 F.3d 1243, 1246 (10th Cir. 2004) (holding that defendant's status as an ex-convict was relevant alongside evidence that he had tried "to delay his encounter with the officer until he could hide something in his glove box"). Critically, upon approaching the passenger side of the Monte Carlo, Officer Ricks observed Hammond wearing colors commonly associated with the Crips gang. Furthermore, the district court found, based on Officer Ricks's testimony, that "there was a feud ongoing between sets of the Bloods and Crips gangs and even between or among sets within the Crips gang itself." Aplt. App. Vol. III at 47.[2]

At this point the officers knew that Mr. Hammond was a gang member who had recently been arrested for weapons possession, that he was riding in the very car

_____

[2] On cross-examination Ricks admitted that there was nothing "notable" about this particular date in terms of feuding between the gangs, but rather that there is basically "always" feuding between the Bloods and the Crips. Aplt. App. Vol. III at 17. However, we accept the district court's factual findings unless clearly erroneous, which, upon consideration of Officer Ricks's testimony, this is not. <u>Davis II</u>, 636 F.3d at 1288 (citing <u>Gregoire</u>, 425 F.3d at 875).

seized during his previous arrest, and that he was wearing gang colors. Here, Officers Ricks and McCants had reasonable suspicion that a suspected felon, who was actively advertising his gang affiliation, was armed. Under those circumstances, an officer is justified in his concern that "his safety or that of others was in danger." Terry, 392 U.S. at 27.

Certainly, the fact that here, unlike in Garcia II, there were two officers is also relevant to the reasonable-suspicion calculus. There, the Court relied heavily on the fact that the only officer on the scene would have to turn his back on the un-restrained suspect while conducting an inventory search. Garcia II, 751 F.3d at 1139. But we have never said, nor do we today, that a second officer's presence and ability to "cover" the first officer eliminates a suspect's supposed dangerousness. See, e.g., United States v. Guardado, 699 F.3d 1220, 1223–24 (10th Cir. 2012) (holding that Terry frisk was justified despite the presence of two officers and only one suspect). That is especially true where, as here, the number of people in the stopped vehicle is the same as the number of officers at the scene. In any event, if Mr. Hammond had a gun readily available in his clothing, it could quickly be grabbed and used against both officers or used to hold one hostage. Thus, we do not find the presence of two officers here ameliorates the risk to Officer Ricks.

Our holding today is not to suggest that Mr. Hammond, or any other person suspected or convicted of an armed crime in the past, may be indiscriminately stopped and frisked on the basis of his criminal history and gang affiliations. Rather, when a (1) known gang member (2) who was a suspect in a prior weapons possession

11

case and who had (3) recently been arrested in connection with another weapons case, is pulled over (4) while riding in a car that had previously been seized in connection with the individual's prior arrest, (5) while wearing colors which loudly display his affiliation with a gang involved in an ongoing feud, it is reasonable for officers to perform a brief, non-invasive search to ensure their own safety and that of the surrounding community.

## III.  CONCLUSION

The totality of the circumstances surrounding Officer Ricks's interaction with Mr. Hammond provided reasonable suspicion that he was armed and dangerous at the time of the traffic stop.  Accordingly we AFFIRM the district court in full.

17-1102, *United States v. Hammond*

**PHILLIPS**, Circuit Judge, dissenting

I agree with the majority that the two officers had objectively reasonable suspicion that Hammond was armed.[1] On that point, I too rely on the information the officers obtained from PIMS—that Hammond had three weeks earlier been arrested for illegally possessing a weapon,[2] in an encounter leading police to seize the same car stopped here; that Hammond had more than a year earlier been a suspect in another weapon-possession case; and that Hammond was a documented member of the Crips gang. I also rely on Hammond's wearing Crips-gang colors that night. For me, those are the facts relevant to whether Hammond was armed.

But some other facts from that evening weigh against dangerousness, unless one takes a view that Hammond would be as likely to fire a gun at police outside their department building in well-lit conditions with many witnesses and a congested escape route.

In analyzing dangerousness, we first must ask dangerous to whom? Here, the asserted danger must be to the two officers (though, of course, any crossfire would

---

[1] "Pat-down searches are constitutional when an officer has reasonable suspicion that an individual is 'armed and dangerous.'" *United States v. Garcia* (*Garcia II*), 751 F.3d 1139, 1142 (10th Cir. 2014) (citing *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007)).

[2] Nowhere in the record, or during oral argument, did the government identify what made this earlier weapon possession illegal. Nor has it done so for the instant arrest, at least until the officers learned that the already-arrested Hammond had a felony conviction.

inadvertently endanger bystanders). So the government cannot prevail on reasonable suspicion of danger just by showing that Hammond might later pose a danger to a rival gang member encountered in a dark alley. Danger is specific to the moment before the police pat down a person.

Though reciting danger-lessening facts early in the opinion, the majority never credits how they weigh against dangerousness. Among these factors are (1) that the stop was for the minor violation of a burned-out taillight; (2) that the police didn't treat the female driver as a threat to their safety; (3) that Hammond was courteous, calm, and compliant, not exhibiting anger, intoxication, or any other worrisome state;[3] and (4) that Hammond voluntarily stood outside the car's passenger-side door in a well-lit, busy intersection, surrounded by commercial buildings, with the Aurora Police Department located on a corner.

In its concluding paragraph, the majority tries to limit the breadth of its holding, approving frisks (patdowns for weapons) to ensure officer safety only "when a (1) known gang member (2) who was a suspect in a prior weapons possession case and who had (3) recently been arrested in connection with another weapons case, is pulled over (4) while riding in a car that had previously been seized in connection with the individual's

---

[3] The district court found "that at all times Mr. Hammond behaved himself, was cooperative, was not aggressive. There's no indication of any furtive movements. There's no indication of any nervous behaviors, none of those kinds of things, nor do the officers claim any of that." R. vol. 3 at 48–49.

prior arrest, (5) while wearing colors that loudly display his affiliation with a gang involved in an ongoing feud[.]"[4] Maj. op. at 11–12.

But the opinion will be applied more broadly than that. I expect that the government will long cite this case as authorizing frisks, and I expect that the government will stress that we allowed a frisk here under *all* of the surrounding circumstances, not just those bearing on whether Hammond was armed. Beyond that, I expect that the government will use this case to argue that safety-protective factors don't matter in considering the totality of circumstances—after all, they're not included in the majority's five-factor analysis. That can't be right.

The majority does specifically review one risk-mitigating factor—that the stop involved two officers and two car occupants. *Id.* at 11. To support its conclusion that "the presence of two officers here [doesn't] ameliorate[] the risk[,]" the majority points out that we have never said that equal numbers "eliminate[] a suspect's supposed dangerousness." *Id*. I agree. But neither have we said that equal numbers can never defeat an objective reasonable suspicion of danger to the officers. We are on unplowed ground here, and in my view, the majority goes too far in extending the circumstances supporting frisks of persons not even suspected of a crime.

The majority may well disagree with me that we are on unplowed ground. After all, it relies on *United States v. Guardado*, 699 F.3d 1220, 1223–24 (10th Cir. 2012), as "holding that [a] *Terry* frisk was justified despite the presence of two officers and only

---

[4] The majority also says that the officers "suspected" and later "confirmed" that Hammond was a felon. Maj. op. at 4, 11. I don't see this in the record.

3

one suspect." Maj. op. at 11. But *Guardado* presents markedly different facts from this case. In *Guardado*, a suspected gang member (Guardado) fled his compatriots when an officer approached the group at about 1:00 a.m. in an "extremely high crime area." *Guardado*, 699 F.3d at 1221–22. As the man ran, he kept one hand in front of his body, leading the officer to believe he was trying to conceal evidence or a weapon. *Id.* at 1222. Upon physically subduing Guardado, the officers strained to remove his hand from underneath his body. *Id.* After doing so, and handcuffing him, one of the officers frisked Guardado's waistband for weapons. *Id.* This far different situation makes *Guardado* a poor candidate to support the majority's extending the availability of frisks.

The majority also relies on *Garcia II*. I see *Garcia II* as an easier case, with facts far different from ours. The stop in that case was on a "sparsely travelled" avenue, with just one officer making the stop. *Garcia II*, 751 F.3d at 1140. After arresting the driver, the officer needed to inventory the car, so the officer had to turn his back to Garcia; the officer apparently couldn't await backup, because of staffing issues; the officer remembered a recent encounter in which Garcia had fled and, when caught, required tasering after assuming a fighting stance with fists clenched; the officer knew that Garcia had a violent felony (armed robbery); the officer knew that Garcia was a drug user, especially heroin; and during the stop, the officer observed that Garcia acted nervously, avoiding eye contact and playing with his hands. *Id.* at 1140–41. The facts in *Garcia II* present far more likelihood of danger to officer safety than do those here.[5]

---

[5] The majority also relies on *United States v. DeJear*, 552 F.3d 1196 (10th Cir. 2009), as a case where the facts "were sufficient to establish reasonable suspicion that the

4

As support for its new rule—that a person like Hammond, reasonably suspected of being armed, always presents a danger in the majority's listed circumstances—the majority makes a fact finding better suited for the district court. Namely, the majority asserts that "if Mr. Hammond had a gun readily available in his clothing, it could quickly be grabbed and used against both officers or used to hold one hostage." Maj. op. at 11. Maybe so. But I think that the district court needs to make that type of finding based on meaningful evidence from the government.[6] And the district court didn't.

In my view, the district court collapsed armed and dangerous into one condition. In other words, it assumed that if the officers had objectively reasonable suspicion that Hammond was armed, then they would automatically have objectively reasonable suspicion that he endangered them during the misdemeanor stop. *See* R. vol. 3 at 46–51. The district court didn't explain how Hammond might endanger an alert officer intently watching him for the few minutes needed to complete the taillight stop. *Id.* Instead, the district court declared the frisk legal based on "common sense," saying that the officer had to do something other than ask Hammond to sit by the curb[7] or ask him how he was doing that evening or about the Denver Broncos. R. vol. 3. at 50. To spare the officer any

suspect was armed and dangerous." Maj. op. at 8. I read *DeJear* as a *Terry*-stop case, upholding reasonable suspicion of criminal activity, not reasonable suspicion that the person was armed and dangerous. *DeJear*, 552 F.3d at 1201 ("[T]he district court properly concluded that [the officer] had reasonable suspicion to detain Mr. DeJear.").

[6] Surely the government could provide evidence, including officer testimony or statistics, explaining common outcomes in this type of circumstance.

[7] As opposed to frisking Hammond, which *Terry* recognizes is a significant Fourth Amendment event, *see Terry v. Ohio,* 392 U.S. 1, 17–18 (1968), the officers might have protected themselves by actions less intrusive than a frisk.

awkward small talk, I guess, the district court approves a frisk instead. I would require more—a fact finding, based on meaningful evidence, that the officers had objectively reasonable suspicion that Hammond would endanger them during the stop.