FILED
United States Court of Appeals
Tenth Circuit

October 29, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

NOAH HUERTA,

    Defendant - Appellant.

No. 25-1050

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:24-CR-00030-PAB-1)**

_____

Dean Sanderford, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the Briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Craig Fansler, Assistant United States Attorney (Peter McNeilly, United States Attorney, Jess D. Mekeel, Assistant U.S. Attorney, on the Brief), Denver, Colorado, for Plaintiff-Appellee.

_____

Before **MATHESON**, **KELLY**, and **MORITZ**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Defendant-Appellant Noah Huerta entered a conditional plea of guilty to being a felon in possession of a firearm or ammunition, reserving the right to appeal the district court's denial of his motion to dismiss and motion to suppress. 18 U.S.C.

§ 922(g)(1); I R. 9–22, 54–67, 102; III R. 5–6, 164–83.  Exercising jurisdiction under

28 U.S.C. § 1291, we affirm the district court's denial of his motion to dismiss, but

reverse the denial of the motion to suppress and remand for further proceedings.

## Background

### A.  The Stop and Patdown of Mr. Huerta

On June 26, 2023, at around 4:20 a.m., a shooting occurred at a convenience

store in Denver, Colorado.  III R. 105.  Police identified a suspect, described as "a

light-skinned Black male who is bald with a thick beard and muscular build[.]"  Id.

A security camera captured a photo of the suspect.  I R. 30; III R. 106.  Police located

the suspect's vehicle, a black Ford Expedition, several hours later.  III R. 23, 108–10,

114.  The vehicle was unoccupied and parked on the street outside of an apartment

complex several miles from the shooting location.  Id. at 23, 106–13.  Members of

the Denver Police Department, including Detective Shurley, surveilled the vehicle

while uniformed officers waited nearby.  Id. at 11–13, 24.  The officers received an

email with the photo of the suspect.  Id. at 25; I Suppl. R. 5.

At around 4:30 p.m., Detective Shurley observed a black sedan pulling up and

parking directly behind the Expedition.  I R. 31; Ex. Z at 45:31–45:37.  He radioed

that two Black females and "a [B]lack male [in] a white T-shirt, white hat [and] red

pants" exited the black sedan and "milled around a little bit" before entering the

complex.  Ex. Z at 46:02–46:19, 46:40–46:46, 49:27–49:32.  Shortly thereafter, the

group exited the complex and got into a white Dodge Durango SUV parked behind

the black sedan.  Id. at 49:32–49:41, 53:32–53:44.  Detective Shurley instructed the

officers to "stop [the Durango] out of the area just to be on the safe side" because of the "proximity of the target vehicle" and the fact that the Black male was "somewhat similar in appearance" to the shooting suspect. Id. at 50:08–50:26.

Nearby officers saw the Durango pull up to a pump at a gas station. III R. 13, 40. They noticed that the Durango had expired license plates and decided to stop it. Id. at 16. Officers Stuper and Parker pulled up behind the Durango in a marked police car, but did not have their emergency lights or siren activated. Id. at 48–49, 52–53. The officers watched as the Durango's driver and front seat passenger exited the vehicle and walked toward the gas station's convenience store. Id. at 49–50.

Less than thirty seconds later, Sergeant Lombardi and Officer Espinosa arrived at the gas station in a marked car with its lights, but not siren, activated, and parked directly next to the other police car. Id. at 16, 72–73; Ex. G at 00:00–00:40. By the time they arrived, the Durango's driver and front seat passenger were near the doors of the convenience store. III R. 84; Ex. G at 00:35–00:47; Ex. 2 at 00:34–00:42. All four officers then exited their vehicles. III R. 83. Sergeant Lombardi approached the two near the store: the Durango's driver, Ashleigh Hampton, and the front passenger, Donta Marshall, Ms. Hampton's husband. Id. at 84, 86; Ex. G at 03:07–03:10. Mr. Marshall, a Black male, wore clothes matching Detective Shurley's description and was thought to be the one who looked "somewhat similar" to the suspected shooter. III R. 49, 85–86; Ex. G at 03:02. But Mr. Marshall was not light skinned or bald, did not have a "thick beard," and had a tattoo on his face. III R. 52, 88; Ex. G at 03:02.

Meanwhile, Officer Parker approached the back left door of the Durango as a female, Crystal Gordon, exited. III R. 74; Ex. F at 00:25–02:12. As Officer Stuper exited his vehicle, the back right door of the Durango opened. Ex. H at 00:19–00:32. Due to the tint on the vehicle's windows, he only then realized there was a fourth occupant. III R. 17, 73–74. Officer Stuper immediately approached the Durango. Ex. H at 00:19–00:32. While doing so, Mr. Huerta began to exit the vehicle with his left hand somewhat near his waistband. III R. 17–18, 57; Ex. H at 00:25–00:34. Officer Stuper instructed, "don't reach for anything" and placed his hands on Mr. Huerta's shoulder and wrist as he exited the car. Ex. H at 00:32–00:36

Officer Stuper turned Mr. Huerta around, held his arms behind his back, and placed handcuffs on him, with Officer Espinosa assisting. Id. at 00:39–00:55. Mr. Huerta asked what was going on, but the officers told him to relax. Id. Officer Stuper testified that Mr. Huerta tensed up and "started to turn his body, both left, right and kind of lean towards the car." III R. 20. Officer Espinosa similarly testified that Mr. Huerta was "squirmish," and that he tried to "cant his body away." Id. at 75–76. According to him, Mr. Huerta appeared not to be listening to the officers' commands. Id. at 76.

The officers saw that Mr. Huerta "had a pouch attached to his belt loop," with the pouch tucked into Mr. Huerta's back right pocket.[1] Id. at 21. Officer Espinosa

---

[1] The record is unclear as to when exactly the officers noticed the pouch. According to a police report, Officer Stuper observed a "bulge" in Mr. Huerta's back right pocket and the pouch itself. I R. 32. However, he testified that he did not see the bulge as Mr. Huerta was exiting the car. III R. 20–21. In the body camera video,

felt the exterior of the pocket and determined that there was a firearm magazine inside. Id.; Ex. H at 01:04–01:25. The officers removed the pouch and severed it from the belt loop. Ex. H at 01:34–01:56. Officer Espinosa asked Mr. Huerta if he had a gun, which Mr. Huerta denied. Id. The officers patted down Mr. Huerta but did not find a firearm. Id. at 02:00–02:15. Officer Stuper placed Mr. Huerta in the back of his police vehicle because Mr. Huerta was "all over the place." Id. at 02:53–03:33.

Officer Stuper conducted name clearances on Mr. Huerta and Mr. Marshall and saw that they both had violent felony convictions. I R. 33, 36–37. Meanwhile, Officer Espinosa asked the driver, Ms. Hampton, for consent to search her vehicle. III R. 78–79. Ms. Hampton consented, and Officer Espinosa found a nine-millimeter handgun in the vehicle near Mr. Huerta's seat. Id. The magazine found on Mr. Huerta fit the recovered handgun. I R. 32.

## B. Procedural Background

Mr. Huerta moved to suppress evidence of the magazine and firearm obtained from the search, arguing that the officers lacked any reasonable suspicion that he was armed and dangerous to justify the patdown that yielded the magazine. Id. at 9–22. The district court held an evidentiary hearing and ruled from the bench. III R. 4–185. The court decided that the totality of the circumstances established reasonable suspicion that Mr. Huerta was armed and dangerous, justifying the patdown and

---

the pouch does not appear to be visible until after he turns Mr. Huerta around to physically restrain him. Ex. H at 00:25–00:45; Ex. G at 00:54–1:40.

recovery of the magazine.  Id. at 180–81.  Though not raised or argued, the court also ruled that even if the patdown was illegal, the firearm would have been inevitably discovered as "the perfect circumstances for a protective sweep" existed.[2]  Id. at 181–82.

Mr. Huerta also moved, for preservation purposes, to dismiss the indictment, arguing the felon-in-possession statute is unconstitutional under New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022).  I R. 54–67.  The court denied the motion.  III R. 5–6, 182–83.  Mr. Huerta now appeals from both denials to this court.[3]

**Discussion**

Mr. Huerta raises two issues on appeal.  First, he argues that the district court erred in denying his motion to suppress because the police lacked reasonable suspicion that he was armed and dangerous.  Aplt. Br. at 12.  Second, he argues, for preservation purposes, that the district court erred in denying his motion to dismiss

---

[2] Although the district court did not explicitly mention the inevitable discovery doctrine, the parties agree that this was such a ruling.  Aplt. Br. at 26; Aplee. Br. at 35.

[3] Mr. Huerta also moved, for preservation purposes, to dismiss the indictment because the felon-in-possession statute is an alleged unconstitutional exercise of Congress's authority under the Commerce Clause.  I R. 48–52.  The district court denied his motion, but he does not now appeal from that denial to this court.  III R. 5–6.

the indictment because § 922(g)(1) is unconstitutional both facially and as applied to him. Id. at 14.

### A. Motion to Suppress

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's finding of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." United States v. Canada, 76 F.4th 1304, 1307 (10th Cir. 2023), cert. denied, 144 S. Ct. 556 (2024) (quoting United States v. Windom, 863 F.3d 1322, 1326 (10th Cir. 2017)). Mr. Huerta does not contest the validity of the stop based on the Durango's expired plates. See Aplt. Br. at 12–14; III R. 174. Rather, he argues that the district court erred by (1) finding there was reasonable suspicion to justify the patdown of Mr. Huerta and (2) holding that the firearm would have been recovered under the inevitable discovery doctrine. Aplt. Br. at 12–14.

For its part, the government argues that the patdown was supported by reasonable suspicion that Mr. Huerta was armed and dangerous based on information that the shooting suspect may have been in the Durango. Aplee. Br. at 17. The government relies upon other factors to bolster its conclusion, including the movements of the Durango's occupants away from the vehicle, Mr. Huerta's movements and response to the officers, the location of the stop, and the officers' original perception that only three, rather than four, persons occupied the Durango. Id. at 17–22. The government also dismisses Mr. Huerta's arguments as a divide and

7

conquer strategy rather than an analysis based upon the totality of the circumstances. Id. at 22–35.  Finally, the government argues that the inevitable discovery doctrine would apply based upon Mr. Huerta's movements, Mr. Marshall's distancing himself from the Durango, and the criminal records of the occupants.  Id. at 35–38.  Mr. Huerta has the better of the argument.

### 1. Reasonable Suspicion

Although the Fourth Amendment prohibits unlawful searches and seizures, U.S. Const. amend. IV, an officer may conduct an investigatory stop, or "Terry stop," if he "has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" United States v. Samilton, 56 F.4th 820, 827 (10th Cir. 2022) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)); Terry v. Ohio, 392 U.S. 1, 21 (1968).  During a lawful stop, "an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous."  United States v. Hammond, 890 F.3d 901, 905 (10th Cir. 2018) (quoting United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996)).  This principle also applies during a valid traffic stop, thereby allowing an officer to order all passengers out of the vehicle and then frisk a passenger provided there is reasonable suspicion that the passenger is armed and dangerous.  United States v. Gurule, 935 F.3d 878, 885 (10th Cir. 2019).

Reasonable suspicion is "based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense."  United States v. Garcia, 751 F.3d 1139, 1143 (10th Cir. 2014)

8

(quoting United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007)).  "We evaluate each factor alleged to support an inference of reasonable suspicion separately and in the aggregate."  Gurule, 935 F.3d at 885.

The primary purpose of a frisk is for officer safety.  Id.  Accordingly, we have recognized that "the officer-safety rationale can overcome even 'limited specific information leading law enforcement to believe that an individual was armed or dangerous.'"  Id. (alterations omitted) (quoting Garcia, 751 F.3d at 1142).  Still, while the reasonableness standard is not onerous, it requires "more than an 'inchoate and unparticularized suspicion or hunch[.]'"  Samilton, 56 F.4th at 827 (quoting Alabama v. White, 496 U.S. 325, 329 (1990)).

The district court found reasonable suspicion for the frisk based on the totality of the circumstances, namely (1) the fact that officers had information that the suspected shooter was in the Durango; (2) the fact that Mr. Marshall and Ms. Hampton attempted to move away, or "separate" themselves, from the vehicle, suggesting the presence of contraband, such as a firearm; and (3) the fact that Mr. Huerta was "moving around" while the officers physically restrained him.  III R. 180–81.  We address these and other factors below.

### a.  The Suspected Shooter's Presence in the Vehicle

A significant factor in this appeal is whether the officers reasonably suspected that Mr. Marshall was the shooting suspect.  Oral Arg. at 03:12–03:41.  In the absence of such reasonable suspicion, the officers would not have reasonably

9

believed that there was a firearm in the Durango and consequently that Mr. Huerta may have been armed and dangerous.

That belief was based on Detective Shurley's instructions to the officers to "stop this car out of the area just to be on the safe side" because of the "proximity of the target vehicle" and the fact that Mr. Marshall was "somewhat similar in appearance" to the suspected shooter.  Ex. Z at 50:08–50:26.  Mr. Huerta argues that the detective's statements amounted to nothing more than a "hunch" and therefore did not give the officers reasonable suspicion to conclude Mr. Huerta was armed and dangerous.  Aplt. Br. at 16–20.  He specifically argues these statements indicated that Detective Shurley did <u>not</u> think that Mr. Marshall was the shooting suspect, contending that the phrase "just to be on the safe side" is a phrase that one uses to "rule out an unlikely possibility," and that the phrase "somewhat similar" suggests that there are both similarities <u>and</u> differences.  <u>Id.</u> at 16–17.  The government contends that Mr. Huerta merely engages in "semantics."  Aplee. Br. at 23–26.

"Mere propinquity to others independently suspected of criminal activity creates neither probable cause nor reasonable suspicion."  <u>Poolaw v. Marcantel</u>, 565 F.3d 721, 737 (10th Cir. 2009) (citation modified); <u>see also</u> <u>Ybarra v. Illinois</u>, 444 U.S. 85, 93 (1979) ("The 'narrow scope' of the <u>Terry</u> exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.").  Any potential connection the group had to the target vehicle was attenuated at best.  After all, they arrived at and departed from the

apartment complex in completely different cars than the Expedition. And Detective Shurley's broadcast gave no indication that the group was associated with the suspect or the Expedition or interacted with the car in any way. That they merely parked behind the target vehicle at an apartment complex in the daytime nearly twelve hours after the shooting is not the sort of articulable and particularized suspicion required to conclude that Mr. Marshall was the shooting suspect, or that Mr. Huerta was armed and dangerous. Samilton, 56 F.4th at 827.

Nor does the mere fact that Mr. Marshall shared some basic similarities with the suspect support this conclusion. See United States v. Jones, 998 F.2d 883, 885 (10th Cir. 1993) (finding no reasonable suspicion where officers stopped two Black men in a black Mercedes solely based on a report that there were two armed Black men in a black Mercedes in the area). Of course, both were Black men with facial hair. But the shooting suspect was described as a "light-skinned Black male who is bald with a thick beard and muscular build[.]" III R. 25, 105. In contrast, Mr. Marshall was not bald, did not have a full beard, sported a notable tattoo on his face, and was not light skinned. Id. at 51–52, 86–88. True, Mr. Marshall was wearing a hat at the time, and the photo was perhaps "grainy," as the government argues. Id. at 49, 85–86; Aplee. Br. at 28. But even a brief comparison of the photo of the suspect — which the officers, including Detective Shurley, received — and Mr. Marshall shows no resemblance between the two. I R. 30; I Suppl. R. 5; Ex. G at 03:02.

Detective Shurley's instruction to the officers to pull over the Durango "just to be on the safe side" underscores the lack of any reasonable suspicion that the

11

shooting suspect was in that vehicle.  See United States v. De La Cruz, 703 F.3d 1193, 1197–98 (10th Cir. 2013) (finding no reasonable suspicion to extend a stop "just to be safe" because the officer "wasn't a hundred percent sure" the defendant was not the suspect).  True, Officers Espinosa and Stuper testified that they heard Detective Shurley's message and interpreted it to mean that "the subject was possibly inside [the] Durango[.]"  III R. 13, 85–86.  But "[t]he existence of reasonable suspicion . . . is measured from the perspective of an objectively reasonable officer, not from the subjective perspective of the particular officer on scene."  De La Cruz, 703 F.3d at 1197.  And while we "defer to all reasonable inferences made by law enforcement officers in light of their knowledge and professional experience distinguishing between innocent and suspicious actions," Gurule, 935 F.3d at 885 (quoting United States v. Pettit, 785 F.3d 1374, 1379 (10th Cir. 2015)), that deference is "not unlimited," United States v. Simpson, 609 F.3d 1140, 1147 (10th Cir. 2010).  Indeed, "deference becomes inappropriate 'when an officer relies on a circumstance incorrigibly free of associations with criminal activity.'"  United States v. Frazier, 30 F.4th 1165, 1174 (10th Cir. 2022) (quoting United States v. Santos, 403 F.3d 1120, 1133 (10th Cir. 2005)).

The district court described Detective Shurley's broadcast as "rather tepid," and we agree.  III R. 143.  Perhaps, in other circumstances, his communications could be enough to support the conclusion that Mr. Marshall was the shooting suspect.  But here, that possibility was based on nothing more than "an 'inchoate and unparticularized suspicion or hunch[.]'"  Samilton, 56 F.4th at 827 (quoting White,

496 U.S. at 329). Detective Shurley communicated his "hunch" to the officers, which they then relied upon to believe Mr. Marshall was the shooting suspect.[4]

Accordingly, even considering the attendant circumstances separately and in the aggregate, reasonable suspicion is lacking to believe that Mr. Marshall was the shooting suspect, let alone armed and dangerous.[5]

### b. The Passengers' Decision to Exit the Vehicle

The district court also found reasonable suspicion based on Mr. Marshall's and Ms. Hampton's decision to exit the vehicle. III R. 180. Officers Stuper and Espinosa

---

[4] We are similarly unpersuaded by the government's contention that our mistake-of-fact line of cases supports a finding of reasonable suspicion here. Oral Arg. at 18:06–18:41, 28:27–29:46; Aplee. R. 28(j) Letter at 1–2. The government points to United States v. Jacquez and United States v. Walraven, holding that mistaken information could support a finding of reasonable suspicion. 284 F. App'x 544, 547–48 (10th Cir. 2008); 892 F.2d 972, 975 (10th Cir. 1989). To do so, the officers relying on such information must have acted reasonably under the circumstances and not on a mere hunch. Jacquez, 284 F. App'x at 547–48; see Walraven, 892 F.2d at 975. But as we have explained, Detective Shurley communicated exactly that — a mere hunch — which the officers then unreasonably relied upon to believe that Mr. Marshall was the shooting suspect. Aplt. Resp. to R. 28(j) Letter at 1 ("[T]he problem in this case is not that the detective gave the officers incorrect information. The problem is that the information he provided did not give the officers reasonable suspicion to believe Mr. Marshall was the suspect.").

[5] As we observed at oral argument, although Mr. Huerta does not argue it, we think that the information the officers themselves had at the time they made the stop further weighs against a finding that they had reasonable suspicion to believe Mr. Marshall was the shooting suspect. Oral Arg. at 06:02–07:37. Officer Stuper testified that he heard Detective Shurley's communications about the group arriving at and leaving the complex, meaning that he was aware of the attenuated connection between the Durango and the shooting suspect. III R. 27, 29–32, 34–36. Additionally, the officers had a photo of the shooting suspect, meaning they could have easily concluded upon arriving at the gas station that Mr. Marshall was not the suspect. Id. at 25–26, 86–88; I Suppl. R. 5.

13

testified that, based on their training and experience, such actions were an attempt to "separate" themselves from the car, suggesting the presence of possible contraband and raising safety concerns for the officers. Id. at 16–17, 73. The district court accordingly found that Mr. Marshall's and Ms. Hampton's actions were "red flags," as "they were not acting the way that people typically do . . . when they are stopped," and that their actions were an attempt to "distance themselves" from something "potentially . . . illegal" inside. Id. at 179–80.

Mr. Huerta argues that "it was unreasonable" for the officers to reach this conclusion because it was entirely innocent for the vehicle's occupants to enter the convenience store to make a purchase or use the restroom. Aplt. Br. at 20–22. He argues that this is especially true here, where only the second police car had its lights activated, and it arrived once Ms. Hampton and Mr. Marshall were close to the door of the store. Id. at 21. We agree.

It may well be suspicious for a motorist to walk away from his or her vehicle during an ordinary traffic stop. But this was not such a stop. When Officer Stuper and Officer Parker pulled into the gas station behind the Durango, they did not have their lights or sirens activated. III R. 48–49, 53. It was only several moments later, when Officer Espinosa and Sergeant Lombardi arrived with their lights activated, exited their car, and ordered Mr. Marshall and Ms. Hampton to stop that the officers displayed any real show of authority. Id. at 16, 72–73; Ex. G at 00:25–00:40. But by then, Mr. Marshall and Ms. Hampton had already exited the car and were approaching the entrance of the gas station's convenience store at a normal pace. III

14

R. 84; Ex. G at 00:32–00:40; Ex. 2 at 00:34–00:37.  Upon being asked to stop, they immediately complied with the officers' instructions.  Ex. 2 at 00:37–01:10.  In short, nothing suggests that Mr. Marshall or Ms. Hampton believed that they had been pulled over when they exited the vehicle.  And under the circumstances, an "objectively reasonable officer" would not have found it unusual that Mr. Marshall and Ms. Hampton did what thousands of people do every day upon arriving at a gas station — exit their vehicle and walk toward the station's convenience store.  De La Cruz, 703 F.3d at 1197.  For similar reasons, we are not persuaded by the government's contention that Mr. Huerta's and Ms. Gordon's decision to exit the Durango was "unusual and suspicious," especially as the body camera footage shows they exited the Durango at approximately the same time as the officers exited their vehicles.[6]  Aplee. Br. at 31; Ex. G at 00:38–00:51; Ex. H at 00:19–00:37.

We also do not think that the officers' training and experience can justify what occurred here, as the government argues.  Aplee. Br. at 30.  Although "an officer need not rule out the possibility of innocent conduct" to satisfy the reasonableness standard, Samilton, 56 F.4th at 828 (quoting Pettit, 785 F.3d at 1379), "there must be a concrete reason to support [the non-innocent] interpretation," Frazier, 30 F.4th at

---

[6] The government also argues that the passengers "likely were aware of the first police car's presence and interest in the Durango."  Aplee. Br. at 31.  But the only evidence it cites for this conclusion is a statement made by Ms. Gordon after she exited the vehicle, wherein she asked the officers: "You turned around before we hopped out of the car, so what's the real excuse?"  Ex. F at 01:02–01:07; Aplee. Br. at 7 n.3.  But it cites no evidence or circumstances suggesting that any of the other passengers were aware of the officers' presence and interest in the Durango.

1177. As we have explained, the occupants of the Durango exited their vehicle upon arriving at a gas station and headed inside, and the officers gave them no cause to believe that they were being stopped. Such conduct was "so innocent . . . as to be innocuous." Simpson, 609 F.3d at 1147. Therefore, it was not reasonable for the officers to believe that such activity was suspicious, particularly given the fact that they were operating on a mere "hunch" that the suspected shooter was in the vehicle. Accordingly, this factor does not weigh in favor of a finding of reasonable suspicion that Mr. Huerta was armed and dangerous.

### c. Mr. Huerta's Behavior

The district court also found the fact that Mr. Huerta was "moving around . . . justified the officers in handcuffing him." III R. 181. The court found that "his movements" and the fact that he was "looking around" contributed to the officers' "need to control him to ensure their safety" because they already had "reasonable cause to believe he was armed and dangerous." Id. Mr. Huerta challenges that conclusion, arguing that his behavior and body language were not concerning. Aplt. Br. at 22–24. Specifically, he claims that it is normal to appear nervous when being handcuffed for no apparent reason and that he turned his body toward the car either because the officers were pushing him or because he was turning to face the officers to speak to them. Id. The government argues in response that Mr. Huerta's movements alone justified the frisk. Aplee. Br. at 32.

The body camera video shows that officers exited and approached the Durango as Mr. Huerta exited the vehicle. Ex. G at 00:38–00:51; Ex. H at 00:37–00:50. He

16

held a phone in his left hand and his right hand was visibly empty. Ex. H at 00:31–00:35. As Mr. Huerta exited the vehicle, Officer Stuper grabbed him and, in a manner of seconds, turned him around and placed his hands behind his back. Id. at 00:32–00:42. Given that Mr. Huerta appeared unaware of the stop, and how quickly Officer Stuper physically restrained him, we do not think it is unusual that he would be "squirmish," particularly because he was already restrained. III R. 75–76. Although Officer Espinosa testified that Mr. Huerta "was not listening" to their commands, he also testified that Mr. Huerta did not react violently to the officers. Id. at 76, 97. And although the officers testified that his behavior raised "red flags" that he might "flee or fight," and the government urges us to defer to those conclusions, the officers restrained Mr. Huerta before he fully exited the Durango. Id. at 18, 76; Aplee. Br. at 21–22.

The government also argues that Mr. Huerta made a "furtive" movement — moving his right hand up toward his waistline — as he was exiting the vehicle. Aplee. Br. at 21. But the government admits that this movement was "slight" and "likely innocuous in hindsight." Id. It was innocuous even in the moment. Officer Espinosa testified that Mr. Huerta did not reach for anything. III R. 55. And the body camera video does not show anything more than Mr. Huerta briefly placing his left hand on his thigh as he was exiting the vehicle. Ex. H at 00:31–00:35.

Mr. Huerta's behavior does not weigh in favor of a finding of reasonable suspicion, particularly when considering the fact that the officers lacked reasonable suspicion to believe that the shooting suspect was in the Durango.

17

### d. Other Factors

The government points to other factors that weigh in favor of a finding of reasonable suspicion, but these arguments are unavailing. First, the government argues that the stop occurred in a high-crime area. Aplee. Br. at 19; III R. 13–14. While the time and place of a stop can be relevant to our reasonable-suspicion analysis, they are insufficient on their own. United States v. Daniels, 101 F.4th 770, 782 (10th Cir. 2024).

Second, the government points to the fact that the officers initially thought there were three individuals in the Durango, not four, and the fact they were "scattered" at the time of the stop to support a finding of reasonable suspicion, pointing to our holding in United States v. Hammond, 890 F.3d 901, 907 (10th Cir. 2018), for support. Aplee. Br. at 19–20. In Hammond, "the number of people in the stopped vehicle [was] the same as the number of officers at the scene," a factor that weighed in favor of a finding of reasonable suspicion to justify a patdown. 890 F.3d at 907. But in Hammond, the officers already knew that the frisked suspect was a gang member and a suspect in a prior weapons possession case, and had recently been arrested in connection with another weapons case. Id. at 907–08. He was also wearing colors that "loudly display[ed] his affiliation with a gang involved in an ongoing feud." Id. at 908. No similar facts are present here.

Other factors also militate against these concerns, including the fact that the stop occurred at a gas station in the daytime in a busy area, and the fact that, as stated above, the officers lacked reasonable suspicion that the shooting suspect was in the

18

Durango.  III R. 37, 113; Daniels, 101 F.4th at 782 (finding the fact that a stop occurred in a parking lot that was "well-lit," "densely populated," and "heavily trafficked" weighed against a finding of reasonable suspicion, even though the stop was in a "high-crime" area).

In sum, even when considering the attendant circumstances individually and in the aggregate, and in the light most favorable to the district court's decision, the record does not support the "minimal level of objective justification" required under the reasonableness standard to believe Mr. Huerta was armed and dangerous. Daniels, 101 F.4th at 775–76 (quoting Sokolow, 490 U.S. at 7).

### 2.  Inevitable Discovery

In the alternative, the district court ruled sua sponte that the officers would have discovered the firearm in the Durango absent the patdown because "perfect circumstances" existed for a protective sweep.  III R. 182.  Mr. Huerta argues there was no evidence in the record to suggest the officers were considering a protective sweep, and that the officers lacked reasonable suspicion that one of the passengers was armed and dangerous.  Aplt. Br. at 26–27.  We agree.

Under the inevitable discovery doctrine, evidence otherwise obtained in violation of the Fourth Amendment may still be admitted if it "ultimately or inevitably would have been discovered by lawful means."  United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)).  The government bears the burden of showing, by a preponderance of the evidence, that the evidence would have been inevitably or ultimately discovered

19

without the Fourth Amendment violation. Id. A lawful protective sweep requires "reasonable suspicion that a suspect poses a danger and may gain immediate access to a weapon." Canada, 76 F.4th at 1307.

The district court cited to the fact that at least one of the Durango's occupants could have reoccupied the car and accessed a weapon as evidence that "perfect circumstances" for a protective sweep existed. III R. 182. But the record suggests otherwise, as Officer Espinosa testified that he only asked for Ms. Hampton's consent to search the vehicle because the patdown of Mr. Huerta yielded a loaded magazine. Id. at 100. In any event, as we have explained, the officers lacked reasonable suspicion to believe that Mr. Huerta — or any of the other passengers — was armed and dangerous. We therefore reject the government's argument that the officers would have searched the vehicle anyway based on the circumstances discussed above. Aplee. Br. at 36–37. Similarly unpersuasive is the government's argument that the officers would have searched the car because there were multiple parolees in the Durango, id. at 38; I R. 33–34, 36–37, as a suspect's criminal record or history is insufficient to create reasonable suspicion, Hammond, 890 F.3d at 906. Therefore, the district court erred in holding that the officers would have inevitably discovered the firearm in the Durango.

For these reasons, the district court erred in denying Mr. Huerta's motion to suppress evidence of the magazine and handgun obtained during the stop.

**B. Motion to Dismiss the Indictment**

Finally, Mr. Huerta argues, for preservation purposes, that his conviction must be reversed because § 922(g)(1) is unconstitutional facially and as applied to him under <u>Bruen</u> and <u>United States v. Rahimi</u>, 602 U.S. 680 (2024).  Aplt. Br. at 27–31.  Mr. Huerta acknowledges that his argument is foreclosed by this court's more recent precedential decision in <u>Vincent v. Bondi</u>, 127 F.4th 1263, 1264–65 (10th Cir. 2025) (holding <u>Rahimi</u> did not abrogate constitutionality of 922(g)(1)).  Aplt. Br. at 27–28.  Accordingly, we affirm the district court's denial of Mr. Huerta's motion to dismiss the indictment.

We REVERSE the district court's denial of Mr. Huerta's motion to suppress and REMAND for further proceedings consistent with this opinion.  We AFFIRM its ruling on the motion to dismiss the indictment.  The motion to schedule oral argument is DENIED as moot.